1

2    IN THE UNITED STATES DISTRICT COURT

3    NORTHERN DISTRICT OF GEORGIA

4    ROME DIVISION

5    INDEX NO.:  4:05-CV-273-HLM

6    - - - - - - - - - - - - - - - - - - -x

     RUBY MANN, as Administrator of the

     Estate of MELINDA NEAL FAIRBANKS

7    and as Guardian of Haley Nicole

     Fairbanks, et al.,

8

9              Plaintiffs,

10

               -against-

11

     TASER INTERNATIONAL, INC., HAMILTON

12   EMERGENCY MEDICAL SERVICES, INC.

     d/b/a WHITFIELD COUNTY EMERGENCY

13   MEDICAL SERVICES, et al.,

14             Defendants.

15   - - - - - - - - - - - - - - - - - - -x

16

17            DEPOSITION of CHARLES WETLI, M.D., taken by

18   Plaintiffs at the offices of Fink & Carney Reporting

19   and Video, 39 West 37th Street, 6th Floor, New York,

20   New York 10018, on Monday, April 7, 2008 commencing at

21   9:00 a.m., before I. Iris Cooper, a Certified

22   Shorthand (Stenotype) Reporter and Notary Public

23   within and for the State of New York.

24

25

```
 1
 2
         A P P E A R A N C E S:
 3
 4               GENEVIEVE L. FRAZIER, P.C.
                         Attorneys for Plaintiffs
 5                       101 East Second Avenue, Suite 350
                         Rome, Georgia   30162-0906
 6
                 BY:   GENEVIEVE L. FRAZIER, Esq., of Counsel
 7
 8
                 MINOR, BELL & NEAL
 9                       Attorneys for Defendant, Hamilton
                             Emergency Medical Services
10                       745 College Drive, Suite B
                         Dalton, Georgia   30720
11
                 BY:   JONATHAN L. BLEDSOE, Esq., of Counsel
12
13
                 TASER INTERNATIONAL
14                       Attorneys for Defendant, Taser
                         17800 North 85th Street
15                       Scottsdale, Arizona   85255-9603
16               BY:   MICHAEL BRAVE, Esq., of Counsel
17
18
                 TERRY E. WILLIAMS & ASSOCIATES, P.C.
19                       Attorneys for Defendant,
                             All Whitfield Defendants
20                       4330 South Lee Street, Building 400-A
                         Buford, Georgia   30518
21
                 BY:   TERRY E. WILLIAMS, Esq., of Counsel
22
23
24
25
```

```
 1                    Wetli, M.D.
 2  C H A R L E S   W E T L I,  M. D., called as a
 3           witness, having been first duly sworn by
 4           I. Iris Cooper, a Notary Public within
 5           and for the State of New York, was
 6           examined and testified as follows:
 7                    MS. FRAZIER:  Ma'am Court
 8                    Reporter, it's been a long time
 9                    since I've taken a deposition up
10                    here in New York.  We have certain
11                    time limitations under the federal
12                    rules, so would you please indicate
13                    any times that our brakes are off
14                    the record because it's the actual
15                    deposition time that we're under the
16                    rules for.
17                         This will be the deposition of
18                    Dr. Charles Wetli taken by the
19                    plaintiffs for purposes of discovery
20                    and all lawful purposes provided under
21                    the Federal Rules of Civil Procedure.
22                    It's taken both by agreement of the
23                    witness and the witness attorney as to
24                    time, place, and manner.  All
25                    objections except for the form and
```

```
 1                    Wetli, M.D.
 2          responsiveness are reserved; is that
 3          agreeable?
 4                    MR. BRAVE:  Yes.
 5                    MS. FRAZIER:  Is the witness
 6          going to reserve signature?
 7                    MR. BRAVE:  Yes.
 8                    MS. FRAZIER:  And then I
 9          assume you'll make those
10          arrangements with the court
11          reporter?
12                    MR. BRAVE:  Yes.
13                    MS. FRAZIER:  Anything else
14          you want to add to the record?
15                    MR. BRAVE:  No.  We want to
16          note that Jerry is not here, just
17          for the record.
18                    MS. FRAZIER:  That's a good
19          idea.  We filed notice and subpoena.
20          Everybody is here except for the
21          sheriff and deputies' attorney.  We
22          have not heard, so we're going to
23          start without them.
24
25
```

```
 1                          Wetli, M.D.

 2    EXAMINATION

 3    BY MS. FRAZIER:

 4          Q      Dr. Wetli, I'm sure you've had

 5    your deposition taken many times before; is that

 6    correct?

 7          A      Correct.

 8          Q      And I understand having been a

 9    medical examiner and probability having

10    testified a number of times in criminal actions

11    that you've been under cross examination many

12    times before; correct?

13          A      Correct.

14          Q      I'm Southern, very Southern, and I

15    drawl out some of my sentences.  I'm sure that

16    oftentimes you will be know where I'm going

17    before I get there because I do speak slowly, so

18    I just don't want us to step on each other.

19                      MS. FRAZIER:  If, Ma'am

20                  Court Reporter, that becomes a

21                  problem because of my regional slang

22                  or drawl, then please let me know

23                  because it is important that the

24                  witness's testimony is accurately

25                  recorded.
```

```
 1                         Wetli, M.D.

 2           Q      If I ask you a question that's

 3     poorly phrased, you do not understand it, please

 4     ask me to.  Obviously, I'm not a medical doctor,

 5     and I may not always articulate and use the

 6     medical terms that are as clear and precise as

 7     both you and I want to try to attain.

 8                   Now, you have provided to me

 9     pursuant to the subpoena served upon you your

10     file, is that correct, here this morning?

11           A      Correct.

12                         (Subpoena was marked as

13                         Plaintiffs' Exhibit A for

14                         identification on this date.)

15           Q      And I've had an opportunity to

16     briefly review it.  Just for the record, please,

17     let me show you what's marked Plaintiff's

18     Exhibit A, and that's the subpoena you've been

19     responding to; correct?

20           A      I believe so, yes.

21                         MS. FRAZIER:  Ma'am Court

22                         Reporter, oftentimes I try to label

23                         most of my exhibits before getting

24                         here, and many of the exhibits have

25                         already been identified and/or used
```

1                        Wetli, M.D.

2                in other matters, so I'll present

3                them to you, but that may not be

4                necessary for relabeling.  We're

5                going to try to use a chronological

6                number.  In other words, I don't try

7                to renumber everything with every

8                exhibit.

9        Q    Let me pull out just a few things,

10   if I can, on your exhibits.

11                MS. FRAZIER:  Good morning,

12                Terry.  We started without you, but

13                we haven't gotten very far.

14        Q    I'm just going to go through it in

15   the order that you handed it to me.  Some of it

16   I may wish to have marked, but most of it I will

17   not.  The cover sheet or the cover pages dated

18   September 17, 2007 appear to be what we called

19   the Rule 26 report.  You're familiar with that

20   term?

21        A    Correct.

22        Q    Is that correct?

23        A    Correct.

24                (Expert report of Charles

25                Wetli, M.D. was marked as

```
 1                    Wetli, M.D.

 2              Plaintiffs' Exhibit B for

 3              identification on this date.)

 4         Q      I have labeled it and we'll mark

 5    it and introduce it as Plaintiff's Exhibit No.

 6    B.  With it, it has a cover sheet that was

 7    provided to me by your attorney.  Would you just

 8    verify that is the same report, please, sir?

 9         A      For the record, Mr. Brave is not

10    my attorney.

11         Q      Is he representing you here today

12    for the purposes of this examination?

13         A      Representing me, no.  But, yes,

14    this is the covering letter.  The is my Rule 26

15    report, yes.

16         Q      The second group of documents

17    dated -- well, the first page at least is dated

18    August 31, 2007.  Is this the letter

19    memorializing your retainment as an expert in

20    this case?

21         A      Yes.

22         Q      Attached to this cover letter

23    appears to be some additional communication

24    referring certain records to you; is that

25    correct?
```

```
 1                    Wetli, M.D.

 2        A    Correct.

 3        Q    I want you to be able to obtain

 4   your originals.  If we can agree, I would like

 5   to have this marked.  We can mark it as B1.  Is

 6   that okay to put a label on it?

 7        A    Sure.

 8                    (Letter and e-mail

 9                    communications between Dr. Charles

10                    Wetli and Taser International were

11                    marked as Plaintiffs' Exhibit B1 for

12                    identification on this date.)

13        Q    These e-mail communications appear

14   to be between you and Taser's attorney; is that

15   correct?

16        A    Correct.  That's from Michael

17   Brave.

18                    (Index for Expert Witness

19                    Binder was marked as Plaintiffs'

20                    Exhibit B2 for identification on

21                    this date.)

22        Q    The third set of documents, index

23   for expert witness binder, who typed that

24   document or who originated that document; is

25   that through your office or through someone
```

```
 1                        Wetli, M.D.
 2    else's office.
 3              A     This is what I received from
 4    Mr. Brave as part of the initial materials.
 5                        (Document titled Exhibit B
 6                    was marked as Plaintiffs' Exhibit B3
 7                    for identification on this date.)
 8              Q     The next set of documents is
 9    entitled Appendix B?
10              A     Correct.
11              Q     Summary of facts.  Is this
12    something that you, under your direction, typed
13    up?
14              A     No.
15              Q     Did you also receive this from
16    Taser's attorney?
17              A     Yes.
18              Q     Who did the white -- excuse me,
19    the yellow, whatever color, the pink?
20              A     I did all the highlighting an
21    marginal notations.
22              Q     So the marginal notations in red?
23              A     Correct.
24              Q     That's your handwriting?
25              A     Correct.
```

```
 1                      Wetli, M.D.
 2           Q      And the pink highlighting is
 3    yours?
 4           A      Yes.
 5           Q      Did you verify the summary of
 6    facts against the original records?
 7           A      Yes.
 8           Q      So everything in this summary of
 9    facts, you should have as original documents?
10           A      Had as original documents.  When I
11    go through these documents, I usually wind up
12    with a mountain of material.  And then I go
13    through the individual documents, for example, a
14    deposition or medical records, and I discard
15    what I don't want and just retain the part that
16    I do want.
17           Q      Now, let me make sure that I
18    understand then.  If I were to go through this
19    summary, everything in this summary, you should
20    have kept in supporting your position?
21           A      No.  I may not have kept it
22    necessarily, no.
23           Q      Well, do you consider everything
24    that's highlighted in pink to be important?
25           A      Well, yes, it's important.  But
```

```
 1                        Wetli, M.D.

 2   this type of highlighting is simply done so that

 3   when I'm reviewing the case at a future date, I

 4   will go through and I will glance concomitantly

 5   at the highlighted areas so I'll know what the

 6   case is all about, and the summary and the

 7   important facts and so is forth.  I also read

 8   additional materials that are not highlighted in

 9   there as well.

10        Q    Well, I guess what my problem is,

11   Dr. Wetli, is that you're making certain

12   representations about facts and your opinions,

13   but none of those documents appear to have been

14   forwarded to you, either in the list of

15   depositions or in some of the indexes.

16             And so while they may be in the

17   summary of facts and they may being correct -- I'm

18   not even suggesting that they are or are not

19   correct.  It's just that from the material, except

20   for this summary, I do not see the backup

21   evidence.

22        A    If the backup evidence was there,

23   I probably discarded it because I don't see any

24   point in keeping duplicates.

25        Q    So you would have discarded all
```

```
 1                        Wetli, M.D.

 2   the deposition testimony?

 3        A    If the deposition testimony was

 4   provided to me, I will usually keep a cover

 5   sheet of the deposition and any pertinent pages

 6   that I felt I wanted to keep.  Usually, I make

 7   notes on the front of the deposition.

 8             This was given to me predominantly

 9   as summary of the facts and so forth.  I will

10   verify those facts, not necessarily each

11   individual one, but that the whole general story

12   is basically as it is related in that document.

13        Q    But you rely on the summary of

14   facts, don't you, to reach your conclusions and

15   your opinions?

16        A    Well, it's one of the things I

17   looked at, yes.

18                  (Appendix C was marked as

19                  Plaintiffs' Exhibit B4 for

20                  identification on this date.)

21        Q    Let me show you Appendix C, which

22   is entitled incident summary.  Is this also what

23   was provided to you by Taser's attorney?

24        A    Yes.

25        Q    And then the only part of the this
```

```
 1                    Wetli, M.D.
 2    document that originated from you would have
 3    been the little red notation at the top and then
 4    the circled or the squared-off pinked time
 5    frame?
 6          A      Right.
 7                 (Appendix D was marked as
 8                 Plaintiffs' Exhibit B5 for
 9                 identification on this date.)
10          Q      The Appendix D, which purports to
11    summarize the witnesses.  Is that a document
12    that originated from you or was that also
13    something that you received from Mr. Brave's
14    office?
15          A      Something that I received from
16    Mr. Brave's office.
17          Q      And so the second page that is
18    highlighted in pink would be the only part that
19    was from you?
20          A      Correct.
21          Q      The next set of documents appear
22    to be portions of the two patient care reports
23    from the EMS?
24          A      Correct.
25          Q      And, again, you received the
```

```
 1                    Wetli, M.D.
 2    information from Mr. Brave, but the highlighted
 3    portion and it is red ink are originated from
 4    you?
 5          A     Correct.
 6                    MS. FRAZIER:  Ma'am Court
 7                Reporter, I didn't identify the
 8                prior document.  Appendix D would be
 9                B5, and then your two portions of
10                the patient care reports
11                collectively is B6, please.
12                    (EMS reports were marked as
13                Plaintiffs' Exhibit B6 for
14                identification on this date.)
15                    (Radiographs Bates stamped
16                456, 455, 454, and 453 were marked
17                as Plaintiffs' Exhibit B7 for
18                identification on this date.)
19          Q     The next group of documents appear
20    to be radiographs from the hospital.  They were
21    Bates stamped by my office as 456, 455, 454, and
22    453.  But you would have received these from
23    Taser's attorney; correct?
24          A     Correct.
25          Q     The next document is a photograph.
```

1                    Wetli, M.D.

2      It was labeled by my office as Plaintiff's

3      Exhibit No. ME166.  Is this the only photograph

4      that you received of the autopsy photographs?

5           A      Correct.

6           Q      Did you receive or look at any of

7      the histologic sections?

8           A      No.

9           Q      Is it customary for you to write a

10     Rule 26 report, as a forensic pathologist,

11     without looking at all the autopsy photographs

12     and without looking at the histologic sections?

13          A      Sometimes that happens.  I prefer

14     to have the histological sections and

15     photographs, but sometimes there are time

16     constraints and I have to write the report

17     before I get those.  And if anything significant

18     comes up later after I examine them, then I have

19     to write a supplemental report.

20          Q      Well, it's been since August, so

21     it would have been six, seven months?

22          A      Right.

23          Q      Eight months maybe?

24          A      Right.

25          Q      Since you were retained.  Have you

```
 1                     Wetli, M.D.

 2    asked at any time for any additional

 3    information?

 4          A       May I just look at my Rule 26

 5    report?

 6          Q       Yes.

 7          A       I think I might have said

 8    something about that at the end of the report.

 9    I'm not sure.  Yes, the last sentence, I

10    essentially asked for those materials.

11          Q       Please note this report may be

12    supplemented should additional materials such as

13    autopsy photographs and histologic sections

14    become available.  Well, you are aware from

15    reviewing Dr. Gowitt's information that they

16    were available, weren't you?

17          A       Of course.

18          Q       Did you make any effort to get

19    them from Taser's attorney in the last eight

20    months?

21          A       No, except for the letter.

22                        (Plaintiff's initial

23                     disclosures was marked as

24                     Plaintiffs' Exhibit B8 for

25                     identification on this date.)
```

```
 1                        Wetli, M.D.

 2           Q      The next document appears to be a

 3      portion of the plaintiff's initial disclosure

 4      under the federal rules.  Is this the entire

 5      document that you received from Mr. Brave?

 6           A      Probably not.  No.

 7           Q      So you just kept part of it?

 8           A      Yes.  There was about 20 pages to

 9      this document.  I kept three pages.

10           Q      Well, the second page that you

11      elected to keep and highlighted in pink focuses

12      on the allegations of excessive use of force,

13      cruel and unusual punishment.  That's what you

14      highlighted; correct?

15           A      Correct.

16           Q      Are you a use-of-force expert?

17           A      Of course not.

18                       (GBI investigative summary

19                    was marked as Plaintiffs' Exhibit B9

20                    for identification on this date.)

21           Q      Let me show you, please,

22      Dr. Wetli, a document that has been described as

23      the GBI investigative summary, Exhibit No. B9.

24      When originally Bates stamped and produced, it

25      was produced in toto and Bates stamped by my
```

                           Wetli, M.D.

1                          Wetli, M.D.

2    office.  Is that the entire document that you

3    received and then you just threw out the rest of

4    it?

5          A     Exactly.  Like I said before, of

6    everything I look at, I only keep what I feel is

7    important or what I want to reference later on.

8          Q     Well, do you recall the things

9    that you tossed?

10         A     No.

11         Q     Are you representing that you

12   received all the depositions of the individuals

13   that are summarized in part in this GBI file?

14         A     No.  I usually keep depositions in

15   a separate area.  If I don't have any copies of

16   the front pages of these depositions, I did not

17   review the depositions.

18         Q     Were you ever made aware that

19   there was a second Taser utilized on the scene

20   that was not originally told to the GBI.

21                    MR. BRAVE:  Objection.

22              Form.

23                    THE WITNESS:  As I recall,

24              two Tasers were used, that's

25              correct.

```
 1                    Wetli, M.D.
 2          Q      Do you have any documentation that
 3  discusses this second Taser that was revealed a
 4  year after the GBI investigation for the first
 5  time?
 6          A      I have no idea when it was
 7  revealed.  I know somewhere in my file, I have a
 8  notation that two Tasers were used.
 9          Q      Could you take a moment and find
10  that?
11          A      It will probably take more than a
12  moment, but I can look, if you wish.  It's
13  probably in the document that you have right
14  there.
15          Q      Here.  Let me give it to you.
16  Have you not located it?
17          A      Not yet.
18          Q      Maybe we'll take a break and look
19  at it again.  In the GBI summary, I note that
20  you did not keep the data port download that was
21  indicated 13 discharges in 22 minutes.  Have you
22  seen it?
23          A      I have 18 discharges listed on
24  your Exhibit No. B4.
25          Q      It's actually Mr. Brave's incident
```

1                           Wetli, M.D.

2      summary.

3                       MR. BRAVE:  Objection.

4                  Form.  That does assume facts not in

5                  evidence.  Translated, I did not

6                  create that.

7                       MS. FRAZIER:  The objections

8                  under the federal rules is objection

9                  to form.

10         Q      So in summary, at least, anything

11     that you thought was important that you

12     received, you kept as with respect to the GBI

13     investigative summary B9?

14         A      Correct.

15         Q      But you don't really know whether

16     you received all of it or not, do you, of the

17     GBI summary?

18         A      As far as I know, I did.

19         Q      For example, the summary, at least

20     appears to start somewhere around -- it's not in

21     order, but 54 -- here's one.  Forty-four appears

22     to be one of the first pages, and then you go as

23     far as 373.  But most of the documents between

24     Page Nos. 44 and 373 are not in there; correct?

25         A      Correct.

```
 1                        Wetli, M.D.

 2          Q      Do you know for certain if you got

 3   anything past 373 today?

 4          A      I didn't make any notations of how

 5   many pages were looked at and how many were

 6   discarded or how many were retained.  What I

 7   decided was important, I retained.

 8          Q      And so you don't even know whether

 9   or not you received the entire summary, correct,

10   today?

11          A      Offhand, I don't know that, no.

12   Excuse me.  I might actually know that.

13   Sometimes the index of materials includes the

14   Bates numbers.  That one doesn't.

15          Q      Dr. Wetli, as a retained expert,

16   you would hope, would you not, that the attorney

17   that retained you would provide you all the

18   necessary documents for you to give a complete

19   and accurate opinion, would you not?

20          A      Of course.

21          Q      And so you don't independently go

22   out and try to determine whether or not they

23   have only selectively provided you the material

24   they want you to review so that you may reach

25   the conclusions they're looking for, do you?
```

```
 1                    Wetli, M.D.
 2                    MR. BRAVE:  Objection.
 3          Form.
 4                    THE WITNESS:  They send me
 5          the materials that they deem are
 6          important for me to look at.  After
 7          I have reviewed them, I may decide
 8          that I want to look at some
 9          additional materials or may decide
10          that what I have is sufficient.  If
11          they choose not to send me certain
12          depositions and so forth and I don't
13          see offhand that they're important,
14          then obviously I'm not going to be
15          aware of them.
16          Q     Or autopsy photographs or
17 histologic sections?
18          A     I requested those.
19          Q     But they were not sent to you?
20          A     They were not sent to me, but I
21 requested them.
22          Q     But a lot of the record, you
23 wouldn't even know about necessarily unless it's
24 something you were experienced enough to
25 recognize, such as in your field, that there
```

```
 1                          Wetli, M.D.

 2    should have been autopsy photographs you weren't

 3    provided and there should have been histologic

 4    sections that you were not provided; isn't that

 5    correct?

 6         A     Well, right.  And there were Taser

 7    reports and things like that.  And if I felt

 8    that those were extremely important and I could

 9    not write my report without those, then, of

10    course, I would have requested them and would

11    not have written the report.

12         Q     Dr. Wetli, you do recognize as a

13    sophisticated expert that has been involved in

14    litigation for many, many years that the

15    material that you received, if in fact not

16    complete, may influence the results that you

17    received, you determined; isn't that true?

18         A     That's why I listed in the opinion

19    letter that my opinions are based on the

20    materials that I reviewed.

21                     (Documents titled medical

22                 records, tab 7, were marked as

23                 Plaintiffs' Exhibit B10 for

24                 identification on this date.)

25         Q     Let me show you what you have
```

```
 1                    Wetli, M.D.

 2    labeled as medical records and mark it as B10.

 3    These appear to be a limited number of the

 4    medical records that my office Bates stamped

 5    that came from the GBI file.  Are these records

 6    the only medical records, in addition to the

 7    radiographs and the patient care reports, we've

 8    already identified that you've reviewed?

 9         A    Well, no.  Like I said before, I

10    only retained those portions that I feel are

11    significant.  I throw the rest away.

12         Q    You throw the rest away?

13         A    Exactly.

14         Q    Let me show you a medical record

15    Bates stamped by my office 495 that was

16    previously labeled and identified as 32K.  Have

17    you ever seen that, Doctor, original doctor's

18    record?

19         A    I don't recall it offhand, no.  In

20    my records, I do have basically the same

21    information.

22         Q    Can you tell me, sir, where in

23    your records you have that she was provided

24    prior to her temperature being taken at 1721

25    that she was given succinylcholine?
```

```
 1                        Wetli, M.D.
 2            A      I probably wouldn't have that
 3      specific fact, because it doesn't mean anything.
 4            Q      Well, you are aware of the
 5      unintended side effects of succinylcholine being
 6      hypothermia, don't you?
 7            A      Never heard of it.
 8            Q      Oh, you've never heard it?
 9            A      Never heard that.
10            Q      Well, were you provided a record
11      that indicated that 1718, prior to her
12      temperature being taken at 1721, that she had
13      warming measures removed from her body?
14            A      I don't have anything about that,
15      no.  At least I don't have it in there.
16            Q      You would agree, would you not,
17      that if she were suffering from hypothermia that
18      she should be cooled down, not warmed up?
19            A      Of course.
20            Q      Isn't it correct, Dr. Wetli, that
21      there are no records of her body temperature,
22      her core body temperature, being taken prior to
23      the administration of succinylcholine and the
24      adding of warming blankets?
25                        MR. BLEDSOE:   Objection.
```

```
 1                      Wetli, M.D.

 2          Q     Go ahead, sir.

 3          A     I don't know when the

 4    succinylcholine was given.  And if I did, it

 5    wouldn't ring a bell with me or mean anything

 6    because I was not aware that succinylcholine

 7    causes hypothermia.

 8          Q     What about the warming blankets?

 9    My question, I guess, let me rephrase it then.

10    Are you aware of any core temperature

11    measurements or any temperatures being taken

12    prior to 1721 in the emergency room?

13          A     No.

14          Q     Dr. Wetli, did you ever work as a

15    emergency room doctor?

16          A     Only in the Army.

17          Q     Would you agree in your medical

18    training that if a physician suspects a

19    condition such as coagulopathy that tests should

20    be ordered?

21                      MR. BLEDSOE:  Object to

22                form.

23                      MR. BRAVE:  Join.

24                      THE WITNESS:  Yes.

25          Q     Are you aware of any tests ordered
```

1                          Wetli, M.D.

2    to confirm coagulopathy in her medical records?

3                          MR. BLEDSOE:  Objection to

4              form.

5                          THE WITNESS:  I don't recall

6              any offhand, no.

7         Q      She didn't die of coagulopathy,

8    did she, Doctor?

9         A      No.

10        Q      In fact, even assuming she had

11   suffered coagulopathy, which will we agree

12   enhances bruising, that lay definition or

13   symptom of it?

14        A      Correct.

15        Q      The coagulopathy didn't cause the

16   bruising; isn't that true?

17        A      True.

18        Q      And so she had the bruising

19   whether or not she had coagulopathy; isn't that

20   true, Doctor?

21        A      Yes.

22        Q      Would you agree, Dr. Wetli, that

23   in order to determine whether or not the heart

24   was abnormal in any size or thickness, that the

25   more reliable measurement postmortem is to weigh

```
 1                    Wetli, M.D.

 2   it and/or look at the tissue sections?

 3        A    Yes.

 4        Q    And so you would also agree that

 5   if the heart is in systole or contracting, that,

 6   in fact, postmortem it may look thicker?

 7        A    No, I wouldn't agree with that at

 8   all.

 9        Q    In your opinion, it's your

10   determination that the left ventricular section

11   of the heart was abnormally thick was based

12   solely on measurements; correct?

13        A    Of course.

14        Q    How did you determine that the

15   heart was not in systole?

16        A    You don't at postmortem.

17        Q    The weight of the heart was

18   normal, wasn't it?

19        A    Yes.

20        Q    Dr. Wetli, would you agree that

21   the mechanism of excited delirium is the same

22   with or without cocaine or methamphetamine and

23   that there is just slightly different pathway to

24   the same end?

25                    MR. BRAVE:  Objection.
```

```
 1                        Wetli, M.D.

 2              Form.

 3                     THE WITNESS:   I can say that

 4              there are numerous causes of excited

 5              delirium which all wind up

 6              presenting the same way, whether

 7              it's due to cocaine, PCP,

 8              amphetamines, schizophrenia, manic

 9              depressive illness, or meningitis.

10        Q     And so the mechanism, though, is

11   the same in manifesting itself as excited

12   delirium.  I mean, you don't necessarily have to

13   have consumed methamphetamine.  You could just

14   have paranoid schizophrenia, for example, and

15   manifest itself as excited delirium or

16   predispose yourself to excited delirium?

17        A     True.

18        Q     And whether or not it is a

19   predisposition due to paranoid schizophrenia or

20   say to methamphetamine for excited delirium, an

21   elevated heart rate due to adrenaline is the

22   pathway; correct?

23                     MR. BRAVE:  Objection.

24              Form.

25        Q     Of death, for fatality?  Let me
```

```
 1                      Wetli, M.D.

 2    rephrase it.

 3            A      Please.

 4            Q      This is where I'm less than

 5    scientifically or grammatically precise as

 6    perhaps you're comfortable with.  Would you

 7    agree with a lay definition that in both cases,

 8    with or without drugs, that when a patient dies

 9    of excited delirium, they essentially OD on

10    adrenaline?

11                      MR. BRAVE:  Objection.

12               Form.

13                      THE WITNESS:  That is a

14               simplistic way of looking at it, but

15               in general, yes.

16            Q      That's something a jury may

17    understand without going through the detail

18    about the neurotransmitters and the dopamine and

19    various more precise medical function, but it's

20    accurate; correct?

21            A      Correct.

22            Q      Doctor, a patient that is

23    manifesting excited delirium symptoms, there is

24    nothing wrong with their sensory nerve system;

25    is that correct?
```

```
 1                       Wetli, M.D.

 2                       MR. BRAVE:  Objection.

 3            Form.

 4                       THE WITNESS:  No, not at

 5            all.

 6       Q     Are you stating that excited

 7  delirium causes a nerve block or is anesthetic?

 8       A     No, I'm not saying that at all.

 9       Q     Can you provide to me, sir, any

10  peer review studies that have been published

11  that would conclude or even suggest that a

12  person suffering or manifesting symptoms of

13  excited delirium feel no pain?

14       A     It's been reported numerous times

15  in the literature that that's one of the

16  characteristics is that they are impervious to

17  pain.

18       Q     Isn't it true that they simply

19  react different to pain; it's not that they feel

20  no pain?

21       A     Well, they do not react to pain.

22  They are impervious to pain.  That's as far as

23  anybody can go with it, unless you happen to be

24  the individual who can talk about it later.

25       Q     Well, behavioral disordered
```

```
 1                    Wetli, M.D.
 2   children react differently to pain, do they not?
 3          A     I don't know.
 4          Q     But we protect them with helmets.
 5   The mentally ill, do they not react differently
 6   to pain, but we protect them in institutions?
 7   We don't just conclude they feel no pain; isn't
 8   that accurate, Doctor?
 9          A     I don't know what the perception
10   of pain is in the mentally retarded or anything
11   like that.  I have no idea.  I know that they
12   have protective gear many times.  But as to
13   their perception of pain, that's beyond my area
14   of expertise.
15          Q     But we'll agree, at least, that
16   the excited delirium does not anesthetize and/or
17   cause sensory nerve blocks; correct?
18                    MR. BRAVE:  Objection.
19               Form.
20                    THE WITNESS:  I don't know
21               what you mean by central nerve
22               blocks.  All I can tell you is that
23               their perception of pain is
24               obviously altered in that they do
25               not respond to any pain.
```

```
 1                    Wetli, M.D.

 2         Q      What is the term, from a medical

 3    standpoint, fight or flight?

 4         A      It's basically a response to when

 5    a person perceives dangerous, they will have

 6    what's called a fight or flight response.  That

 7    is basically based on a rush of adrenaline.

 8    They get dry mouth, vegetative functions are

 9    diminished, eyes dilate, they have increased

10    strength, hypervigilant.

11         Q      They may fight through pain in a

12    manner that otherwise a person perceiving that

13    fear would not?

14         A      I don't know that.

15         Q      Dr. Wetli, other than the Heston

16    versus Taser International case, have you been

17    retained by Taser in any other cases?

18         A      Specifically by Taser, no.

19         Q      Have you been retained in any

20    other cases in which Taser was a party?

21         A      Yes.

22         Q      And were you retained by the law

23    enforcement defendant or plaintiff, whoever

24    represented the government?

25         A      In one case, I was retained by the
```

```
 1                    Wetli, M.D.
 2   prison health systems.  And in another case, I
 3   was retained by the City of Akron, but not by
 4   law enforcement.
 5          Q     But the government entity?
 6          A     Correct.
 7          Q     And Taser was a party to both of
 8   those as well?
 9          A     Yes.  And then there was another
10   one where I was retained by the plaintiff
11   attorney where Taser was being -- well, at that
12   time, I don't believe suit was filed, but the
13   intent was that they were going to put a lawsuit
14   against Taser.
15          Q     Is the City of Akron Ohio; is that
16   correct?
17          A     Correct.
18          Q     Is that the lawsuit where Taser
19   had sued the three medical examiners trying to
20   effect a change in their conclusion that Taser
21   contributed to the death of one or more
22   individuals?
23                    MR. BRAVE:  Objection.
24              Form.
25                    THE WITNESS:  Taser and also
```

1                       Wetli, M.D.

2                 the City of Akron.

3           Q     Because, of course, the City of

4    Akron may also be responsible for the death

5    through their law enforcement agency that use

6    the Taser weapons; correct?

7                       MR. BRAVE:  Objection.

8                 Form.

9                       THE WITNESS:  That may be

10                correct.  I'm not positive because I

11                don't recall that detail offhand.

12                But I know the City of Akron is

13                involved in the suit somehow.

14                That's why they retained me.

15          Q     Dr. Wetli, were you involved in

16   any of the research that Taser has funded that

17   was conducted in large part by Mark Kroll and

18   Dorin Panescu in attempt to discredited medical

19   examiner reports and to be used in this lawsuit

20   against these three medical examiners?

21                      MR. BRAVE:  Objection.

22                Form.

23                      THE WITNESS:  No.  I've been

24                involved in no research for Taser.

25          Q     Has Taser funded either directly

```
 1                    Wetli, M.D.
 2   to you and Deborah or indirectly by paying your
 3   employers or other organizations on your behalf
 4   to do any research?
 5           A     No.
 6           Q     Conducting research?
 7           A     I have not been engaged in any
 8   research concerning Taser devices either
 9   directly or indirectly.
10           Q     Now, if I understand correctly,
11   Deborah Mash was sort of your protege?  Is that
12   a good term?
13           A     No that's not a good term.
14           Q     She worked with you for a number
15   of years ago; correct?  You were a medical
16   examiner in Dade County and she was in research
17   in some capacity?
18           A     Right.  She was a research
19   neuropharmacologist.  I was a medical examiner.
20   I have certain materials that she wanted.  The
21   law permitted me to provide these materials to
22   her, so I did.
23           Q     Essentially, brain tissue?
24           A     Exactly.
25           Q     If I understand correctly, she was
```

1                    Wetli, M.D.

2    then looking at a relationship of the dopamine

3    transmitters and certain stimulants such as

4    cocaine?  Is that an oversimplification?

5          A    That's close.  Basically, she was

6    looking for receptor sites for cocaine in the

7    brain, and that led to her observations about

8    the effects on dopamine transporters, sigmoid

9    receptors and things that I don't understand.

10         Q    Now, if I understand correctly, in

11   the Heston case, there was the brain tissue was

12   provided to Deborah Mash, and perhaps you saw

13   those histologic findings; is that correct?

14         A    I believe so.  I believe that's

15   correct.

16         Q    In this case with Melinda, there

17   has not been such an examination; is that

18   correct?

19         A    I think what you're referring to

20   are portions of brain that were sent to Dr. Mash

21   for determination of the pattern of receptor

22   sites.

23         Q    Yes, sir.

24         A    That was I believe was done in

25   Heston.  That was not done in the case of

1                    Wetli, M.D.

2     Melinda Fairbanks, but they're not histological

3     sections.   They different.

4          Q     Dr. Wetli, are you familiar with a

5     study that was done in Canada in 1998.   It was

6     by a number of doctors entitled "Unexpected

7     Death Related to Restraint for Excited Delirium,

8     a Retrospective Study of Deaths in Police

9     Custody?"   It's been labeled as Plaintiff's

10    Exhibit No. 233.

11         A     Yes, I know this article.

12         Q     Would you agree with the

13    interpretation and essentially what I'll call

14    warning or a caution that law enforcement

15    authorities and others should bear in mind the

16    potential for the unexpected death of people in

17    states of excided delirium or who are restrained

18    in the prone position or with neck hold?

19         A     I remember reading that, yes.

20         Q     Do you agree with it?

21         A     Do I agree with it.   Aside from

22    the implication that either the prone

23    position -- that the prone position could kill

24    somebody, I don't agree with that.   Obviously,

25    if a neck hold has been used and you have to

```
 1                        Wetli, M.D.
 2   exclude asphyxial death where a lateral vascular
 3   neck restraint could have turn into a choke
 4   hold.
 5           Q     Well, do you agree that there
 6   seems to be a temporal association, at least
 7   with fatalities, due to excited delirium and
 8   restraint?
 9                        MR. WILLIAMS:  Object to
10                 form.
11                        THE WITNESS:  A temporal
12                 relationship, yes.
13           Q     Isn't it true, Doctor, that much
14   of your research as well as much of the
15   scientific community's research about excited
16   delirium is theoretical?
17                        MR. BRAVE:  Objection.
18                 Form.
19                        THE WITNESS:  Well, the
20                 research is not theoretical.  The
21                 research, at least the research I've
22                 done and others have done, had to be
23                 retrospective based on various
24                 observations, and then these various
25                 hypotheses have been tested.  Some
```

```
 1                         Wetli, M.D.

 2                have not been tested.  That's as far

 3                as I can really go with that.

 4                     In other words, the basic

 5                observations are there.  They raise

 6                questions as to, for example,

 7                mechanism of death.  And then other

 8                researches have gone and said this is

 9                possible, this is not possible.

10        Q      Well, let me see if I understand

11   it correctly.  Would you agree with respect to

12   the scientific methodology that you start off

13   with a hypothesis?

14        A      Correct.

15        Q      And then you collect data?

16        A      Correct.

17        Q      And then you summarize what that

18   data means to you or you interpret that data?

19        A      Usually you have the data first.

20   And from the data, you develop a hypothesis, and

21   then you test that hypothesis by developing an

22   experimental method.

23        Q      And you reach your conclusions?

24        A      Correct.

25        Q      Have you ever read Robert Park's
```

```
 1                     Wetli, M.D.
 2   book on "Voodoo Science, the Road From
 3   Foolishness to Fraud?"
 4         A     No.
 5         Q     Are you familiar with the book by
 6   Thomas Cook and Donald Campbell, "Quasi
 7   Experimentation, Design, and Analysis for Field
 8   Settings?"
 9         A     No.
10         Q     Would you agree with the statement
11   that the design of studies may be constructed in
12   such a way that they introduce all sorts of
13   opportunities for uncertainty and error?
14         A     Of course.
15         Q     Would you agree that researchers
16   may not intentionally set out to produce biased
17   results, but their biased world view may still
18   impact the experiment and that both the
19   experimental design and the measurement of the
20   experimental treatment can be impacted
21   intentionally or inadvertently by the
22   researcher?
23         A     Of course.
24         Q     Dr. Wetli, because of ethical
25   considerations, of course, you can't as a
```

```
 1                    Wetli, M.D.
 2  scientist or simply take a patient that is
 3  mentally ill, shoot them multiple times with a
 4  Taser, and then measure their catecholamine or
 5  adrenaline levels; isn't that true?
 6          A     Sure.
 7          Q     And you can't just sit by, let
 8  them die, dissect their brain, and look at their
 9  neurotransmitter levels?
10          A     Correct.
11          Q     Isn't that correct?
12          A     Correct.
13          Q     And in a world which we don't
14  fortunately live in where ethics would not be a
15  consideration, you could also take a patient,
16  shoot them up with methamphetamine and go
17  through the same series, but that's not
18  possible; isn't that true?
19          A     Correct.
20          Q     And you would have your control
21  group out here without a Taser, without being
22  shot multiple times with a Taser.  You can make
23  these comparisons, and we would know for sure
24  exactly whether or not and to what extent
25  prolonged and repeated discharge of a Taser
```

```
 1                    Wetli, M.D.
 2  weapon against a person, the effect that it
 3  would have; correct?
 4                    MR. BRAVE:  Objection to
 5              form.
 6                    THE WITNESS:  Yes.  The only
 7              way you can do those experiments is
 8              if you have a volunteer and it has
 9              been previously approved by research
10              review boards before you do it.
11        Q     Well, you would agree, would you
12  not, that you can't volunteer a mentally ill
13  person?
14        A     Correct.
15        Q     And the research board is not
16  going to approve shooting up a healthy person
17  with a methamphetamine for your research;
18  correct?
19        A     That's not necessarily true.
20        Q     So you think that you can find
21  statistically enough healthy individuals to
22  perform a statistically valid test where you can
23  shoot them up with methamphetamine and then
24  discharge a Taser weapon against them multiple
25  times?
```

```
 1                        Wetli, M.D.

 2        A     You might be able to do that, yes,

 3   for volunteers.

 4        Q     Have you ever seen any volunteers

 5   that would volunteer for that length of time?

 6        A     I've seen volunteers subject

 7   themselves to subjected to Tasers, yes.  I don't

 8   know if anybody ever wanted to put them on

 9   methamphetamine or if it was even proposed and

10   considered by an ethical review board.  I don't

11   know.

12        Q     Dr. Wetli, isn't it true that the

13   most that an individual has volunteered and has

14   arguably been successful in enduring would be

15   three five-second discharges through some test

16   that Dr. Ho tried to conduct?

17                   MR. BRAVE:  Objection.

18             Form.

19                   THE WITNESS:  I saw one test

20             result where a person was subjected

21             to 45 seconds of Taser discharged

22             continuously.

23        Q     And who was that?

24        A     I don't know who it was.

25        Q     What peer review study was that?
```

```
 1                       Wetli, M.D.

 2            A     I don't know.  It was at a

 3    seminar.  It was a videotaped, and they showed

 4    it from start to finish.

 5            Q     Was that somebody associated with

 6    Taser International?

 7            A     I believe it was Dr. Ho that did

 8    it.  I'm not sure where they got the volunteer

 9    from.  He might have been a police recruit or

10    something.

11            Q     Are you familiar with Dr. Ho's

12    association with Taser?

13            A     I know that he has an association

14    with Taser.

15            Q     This wasn't reported in any peer

16    review study?

17            A     I have no idea.  I haven't seen

18    it.  It might be.  I don't know.

19            Q     Doctor, would you agree that

20    historically over time there have been

21    scientific -- I'm going to use the word theories

22    or scientists have reached certain conclusions,

23    medical doctors have reached certain conclusions

24    that over time had proven to be untrue?

25            A     Of course.  That's the scientific
```

```
 1                    Wetli, M.D.

 2   method.

 3        Q    And one of an issue that is

 4   probably closer to what most jurors are familiar

 5   with would, for example, be what is causing the

 6   drastic increase today in autism?  Would you

 7   agree with that, that there's --

 8                    MR. BRAVE:  Objection.

 9               Form.

10                    THE WITNESS:  Let's put it

11               this way.  Obviously, it's in the

12               poplar media that there is an

13               increase in autism, but I'm not

14               sure -- I don't think anybody is

15               really sure why that happens, so

16               there's differences in diagnostic

17               criteria where there is a true

18               increase.

19        Q    And so you would agree, at least,

20   that it's not surprising that the pharmaceutical

21   industries are spending millions of dollars to

22   consultants and scientists to disprove or

23   conclude that it's not anything in their

24   vaccines; that doesn't surprise you, does it?

25                    MR. BRAVE:  Objection.
```

```
 1                    Wetli, M.D.

 2             Form.

 3                    THE WITNESS:  That wouldn't

 4             necessarily surprise me, no.

 5        Q     And it also wouldn't surprise you

 6    that the government certainly doesn't want it to

 7    be something in the vaccines because they've

 8    mandated that children receive these vaccines?

 9                    MR. BRAVE:  Objection to

10             form.

11        Q     Isn't; is that true?

12        A     Well, I can't -- I don't know

13    what's in the mind of government officials as

14    far as vaccines are concerned.  But I think

15    anybody, government or non-government, citizen

16    or physician, would not like to see contaminated

17    vaccines or have an untoward effect as a result

18    of a vaccine.  Certain vaccinations are going to

19    have untoward results, like small pox

20    vaccinations.

21        Q     And what I'm trying to reach in

22    this discussion or examination, Dr. Wetli, is

23    essentially that what you have already agreed

24    to, is that whether through experimental design

25    or intentionally or inadvertently, a
```

```
 1                      Wetli, M.D.

 2     researcher's bias may impact the conclusions

 3     that they reach; isn't that correct?

 4          A     Of course.  Of course.  That's

 5     every field of science.

 6          Q     Dr. Wetli, would you consider

 7     evolution a fact or a theory?

 8          A     It's a fact.

 9                      (Whereupon, at 10:05 a.m., a

10                 recess was taken to 10:17 a.m.)

11                      (The deposition resumed with

12                 all parties present.)

13     C H A R L E S   W E T L I, M. D.,     resumed

14           and testified further as follows:

15     BY MS. FRAZIER:

16          Q     The next set of records is

17     apparently the autopsy and toxicology report,

18     which again was provided to you by Taser's

19     attorney.  And the highlighted portion is your

20     work product; correct?

21          A     Correct.

22          Q     We'll label that as B11.

23                      (Documents titled Autopsy &

24                 Toxicology Reports, tab 7, were

25                 marked as Plaintiffs' Exhibit B11
```

1                      Wetli, M.D.

2               for identification on this date.)

3                    (Documents titled Depos of

4               Sgt. Vicki Burge and Paramedic

5               Gearring were marked as Plaintiffs'

6               Exhibit B12 for identification on

7               this date.)

8          Q     The next set of documents, sir, is

9    the cover sheet you had written.  That is your

10   writing; correct?

11         A     Correct.

12         Q     Deposition of Sgt. Vicky Burge and

13   paramedic Gearring.  It does not appear that you

14   have kept any of the depositions, assuming that

15   they were received, which perhaps they weren't,

16   of the paramedic that came to the scene of

17   arrest or any of the deputies.  So if I

18   understand your earlier testimony, unless you

19   have a cover sheet which would suggest that you

20   received it, you may not have received these;

21   correct?

22         A     That's correct.  I always keep the

23   deposition cover sheets, at any rate, and

24   frequently I'll put notes in the front.  And if

25   there are any particular pages of interest, I'll

1                          Wetli, M.D.

2      attach those.

3                          (Document titled Dr. Gowitt

4                      Report and Deposition was marked as

5                      Plaintiffs' Exhibit B13 for

6                      identification on this date.)

7           Q       The next group of documents is

8      Dr. Gowitt's Rule 26 report and portions of his

9      deposition; is that correct, sir?

10          A       That's correct.

11          Q       And, again, the part that is your

12     work product would be the handwriting and the

13     highlighted portions?

14          A       Correct.

15                          (Rule 26 for Darrell Tidwell

16                      was marked as Plaintiffs' Exhibit

17                      B14 for identification on this

18                      date.)

19          Q       What we'll label as B14 will be

20     portions of the use of force expert, plaintiff's

21     use of force expert, Rule 26 for Darrell

22     Tidwell; correct?

23          A       Correct.

24                          (Rule 26 for Charly Miller

25                      was marked as Plaintiffs' Exhibit

```
1                    Wetli, M.D.
2              B15 for identification on this
3              date.)
4         Q    B15 would be portions of one of
5    the experts designated by the plaintiff for
6    pre-hospital emergency medicine, Charly Miller;
7    is that correct, sir?
8         A    Correct.
9         Q    Do you consider yourself an expert
10   in pre-hospital emergency medicine?
11        A    Of course not.
12        Q    I'm not going to label the others.
13   I just want to identify them, please, sir.
14   Taser has produced to you the defendant's
15   objections to plaintiff's motions to exclude
16   testimony of Dr. Oliver and his attached
17   affidavit; is that correct?
18        A    Correct.
19        Q    The response and affidavit by Dr.
20   Gowitt not among these materials, so I must
21   assume that you have not received that; correct?
22        A    Correct.
23        Q    The other document or one of the
24   other documents that we'll label that I want to
25   reference would be Tom Neuman's Rule 26 report.
```

```
 1                    Wetli, M.D.
 2  Do you know Dr. Neuman?
 3          A     Yes.
 4          Q     You met him through his
 5  representation or his relationship with Taser?
 6          A     No.
 7          Q     How did you know Dr. Neuman?
 8          A     I knew of him by his publications,
 9  the one he did with Dr. Chan in San Diego.  I
10  think I first met him in a case we were both
11  working on in San Luis Obispo.  That was five,
12  six years ago.
13          Q     Well, his work with Dr. Chan, that
14  was Taser related, was it not?
15          A     No.  Not the initial work, anyway.
16          Q     The next document would be the
17  Rule 26 report from Deborah Mash; correct?
18          A     Correct.
19          Q     Of course, you had knew
20  Deborah Mash a number of years ago, long before
21  your retainment by Taser?
22          A     Yes.
23          Q     And the next Rule 26 report is
24  that of Don Dawes?
25          A     Correct.
```

                         Wetli, M.D.

1

2        Q      You are aware of Dr. Dawes and

3   Dr. Ho's financial relationship with Taser?

4        A      I know there is a relationship.  I

5   don't know what that financial relationship is,

6   and I don't know anything about Dr. Dawes's

7   relationship with Taser.

8        Q      You weren't aware that Dawes and

9   Ho conducted a number of studies that were

10  financed by Taser?

11       A      Yes, I knew that.

12       Q      The last Rule 26 report is by

13  Mark Kroll?

14       A      Correct.

15       Q      Do you know Mark Kroll?

16       A      I met him, yes.

17       Q      You are aware then, of course,

18  that he's on the board of directors of Taser

19  International?

20       A      I know he works for Taser

21  International.  I don't know where he is in the

22  hierarchy.

23       Q      Were you aware that he was an

24  officer -- I'm not sure of his precise title --

25  over the research and development department?

```
 1                      Wetli, M.D.
 2                 MR. BRAVE:  Objection.
 3          Form.
 4                 THE WITNESS:  I don't know
 5          that.
 6      Q     Or some type of medical supposed
 7  research?
 8                 MR. BRAVE:  Objection to
 9          form.
10                 THE WITNESS:  I'm not aware
11          of that, no.
12      Q     Were you aware that he was one of
13  the parties that was sued in the shareholder
14  derivative suit for alleging fraud and
15  misappropriation of Taser International insider
16  trading?
17      A     I have no idea.  I don't know
18  anything about that.
19      Q     So you don't know how many
20  millions of dollars Mark Kroll has made through
21  the association with Taser?
22      A     I have no idea about the financial
23  aspects or, as I said, even where he is in the
24  hierarchy.
25      Q     Well, did you rely on anything
```

```
 1                       Wetli, M.D.
 2     that any of these consultants who have a
 3     financial relationship with Taser International,
 4     vis-a-vis Dawes, Ho, Kroll particularly, had to
 5     say in reaching your opinions?
 6            A       No.   My opinions, I think, were
 7     reached independently of what they had to say.
 8            Q       Do you know another individual
 9     that is associated with Taser, John Peters?
10            A       Yes.
11            Q       How do you know him?
12            A       He invited me to be a speaker at
13     the Institute for the Investigation of
14     In-Custody Deaths.
15            Q       Do you know how that institution
16     is related to Taser International?
17            A       No.   I know there's a
18     relationship, but I don't know what that
19     relationship is.
20            Q       Do you know what Taser's attorney
21     here, Mr. Brave's relationship is with that
22     organization and John Peters?
23            A       No, I do not.
24            Q       Did you know he was even related
25     or associated with that organization?
```

                    Wetli, M.D.

1

2          A     Well, I saw him at the last

3    meeting.

4          Q     Other than receiving money as an

5    expert here in this particular case and as an

6    expert in the Heston matter, have you

7    received -- let me rephrase it.  Other than

8    being paid to speak -- I assume you were paid at

9    the In-Custody Death Institute?

10         A     No, that was not paid.

11         Q     Were your expenses, your hotel and

12   travel expenses reimbursed?

13         A     Yes.

14         Q     So it wasn't at any cost to you?

15         A     Correct.

16         Q     So other than that particular

17   occasion and being paid as an expert in this

18   case and the Heston case by Taser, have you

19   received any other remuneration, money,

20   benefits, stock options, stock, anything from

21   Taser?

22               MR. BRAVE:  Objection.

23         Form.

24               THE WITNESS:  No.

25         Q     There was an abstract published,

1                          Wetli, M.D.

2      and it was probably more than an abstract, but

3      by the time I'm starting to look for it, it's

4      only in abstract form that I can find on the

5      Web.  July 1, 1985 that purports to be a paper

6      of yours, "Cocaine-Induced Psychosis and Sudden

7      Death in Recreational Cocaine Users."  Do you

8      recall that paper?

9            A     Yes.

10           Q     In that, it states that the

11     excited delirium appearance should prompt

12     immediate transport of the victim to a medical

13     facility, continuous monitoring, administration

14     of appropriate cocaine antagonist, and

15     respiratory support will hopefully avert a fatal

16     outcome.  Do you still believe that?

17           A     Not exactly.  I think that --

18     that's not an easy question to answer.  The

19     short form of the answer to that would be if the

20     person appears to be in excited delirium,

21     transporting them to the hospital should be a

22     first priority.

23           Q     There was another abstract,

24     Doctor, and I apologize.  It's "Sudden Death

25     From Cocaine-Induced Excited Delirium, an

```
 1                    Wetli, M.D.
 2   Analysis of 45 Cases."  Do you recall that?
 3         A     Yes.  It would have been in 1995.
 4         Q     In that study, you reviewed
 5   certain autopsies; is that correct?
 6         A     Correct.
 7         Q     And hospital records as well, it
 8   appears?
 9         A     Correct.
10         Q     You conclude from the
11   investigation that the fatal collapse occurred
12   suddenly within a few minutes to an hour after
13   the restraints were applied in five police-used
14   techniques that included hogtied, choke hold,
15   head lock, and lateral vascular neck restraints.
16   However, complete investigation and autopsy
17   failed to relate police actions to the deaths.
18               Do you recall that?  Is that pretty
19   much what you've concluded in that study?
20         A     Yes, that was one of the
21   conclusions.
22         Q     And you reviewed cases of 22 white
23   males, 22 black males, and one black female with
24   ages ranging from 21 to 45?
25         A     Correct.
```

                              Wetli, M.D.

1

2          Q      Dr. Wetli, was the medical

3    examiner's office out of Dade County, was that

4    part of the Florida Bureau of Investigation?

5          A      I never heard of the Florida

6    Bureau of Investigation.

7          Q      What is their equivalent of the

8    Georgia Bureau of Investigation?

9          A      The Florida Department of Law

10   Enforcement, the FDLE.

11         Q      Was that a part of FDLE?

12         A      No.

13         Q      Was it financed by the government?

14         A      Sure.  It was a county department.

15         Q      Was it related to or an arm of law

16   enforcement?

17         A      Not at all.  It was totally

18   independent.  Just to clarify, at the state

19   level, the medical examiner examination did come

20   under -- it wasn't FDLE.  It was something with

21   law enforcement, but it wasn't -- it was chosen

22   basically, again, to be under law enforcement as

23   opposed to being under the health department.

24                That was simply at the state level,

25   and it was a place to -- a niche to put the

```
1                    Wetli, M.D.
2    medical examiner's commission book.  That was the
3    only relationship to law enforcement.
4            Q      When you were with the Dade County
5    Medical Examiner's office, was part of your job
6    responsibilities to conduct autopsies or was
7    your job primarily administrative?
8            A      I had administrative
9    responsibilities as the deputy chief medical
10   examiner, but I was in the same autopsy rotation
11   as everybody else.
12           Q      So you did actually conduct
13   autopsies yourself?
14           A      Yes.
15           Q      Did you ever conduct any autopsies
16   where an individual died after having been tazed
17   multiple times over a prolonged period?
18           A      No.
19           Q      Another one of your papers that
20   apparently Dr. Mash contributed to, "Fatal
21   Excited Delirium Following Cocaine Use,
22   Epidemiologic Findings Provide New Evidence for
23   Mechanisms of Cocaine Toxicity."  Do you recall
24   that paper?
25           A      In fact, that's the one I brought
```

1                    Wetli, M.D.

2    with me today, yes.

3         Q     In that, you did a review, you

4    with the assistance of some others, I believe,

5    did a review, as I understand again, of

6    autopsies; is that correct?

7         A     Yes.

8         Q     And medical records accompanied

9    that, to the extent that you have them?

10        A     Right.  To clarify, Dr. Ruttenberg

11   was at that time working for the Centers for

12   Disease Control.  He would review the medical

13   examiner case files.  The medical examiner's

14   case files included police reports and medical

15   records, as well as the autopsy reports.

16        Q     And in this study, is this correct

17   that compared with the controls, excited

18   delirium deaths were more frequently in black

19   male and younger and less likely to have a low

20   body mass index more likely to have died in

21   police custody; is that correct.

22        A     Correct.

23        Q     Now, was it in the mid-'90s when

24   you and perhaps Dr. Mash began to develop the

25   theory that chronic cocaine use disrupts

1                      Wetli, M.D.

2    dopamine functions?

3            A      That was Dr. Mash's contribution,

4    if you will.

5            Q      You would agree that qualified

6    experts may disagree with the conclusions

7    reached from certain data?

8            A      Of course.

9            Q      In a study conducted and published

10   as, Cocaine-Associated Rhabdomyolysis and

11   Excited Delirium, Different Stages of the Same

12   syndrome."  Do you recall that paper?

13           A      Yes.

14           Q      Was it your hypothesis in the

15   beginning of that study that the

16   cocaine-associated rhabdomyolysis and ED were

17   different stages of the same syndrome?

18           A      That was the hypothesis at the

19   time, yes.

20           Q      And that's what you concluded?

21           A      Yes.

22           Q      Have you ever published a study

23   where your conclusions were different or adverse

24   to your hypothesis?

25           A      As I said before, the way medical

```
 1                        Wetli, M.D.
 2    examiners do their research is you accumulate
 3    the data first, and then you essentially arrive
 4    at the hypothesis.  You make observations, and
 5    then you draw your conclusions and make your
 6    hypothesis from that.
 7                 So it's different than the pure
 8    person that is doing pure scientific research.
 9    For example, Dr. Mash might contend that cocaine
10    is interfering with dopamine transport and then
11    she can design an experiment to show that it does
12    interfere or it doesn't interfere, and then you
13    can draw your conclusions.
14                 So it's a little bit different when
15    you're looking at pure science versus
16    retrospective observations.
17         Q     So retrospective observations are
18    much more dependent upon your interpretation of
19    the data to form your hypothesis?
20         A     Both require interpretation of the
21    data.  But usually in a retrospective study,
22    you're basically accumulating the data, age,
23    race, sex, circumstances of death, and so forth
24    and then drawing hypotheses and conclusions from
25    that, as opposed to starting off with a
```

```
 1                     Wetli, M.D.
 2    hypothesis and then designing an experiment to
 3    prove or disprove a hypothesis.
 4         Q     Well, to go back to my original
 5    question then, if I understand correctly, no,
 6    you've never had a hypothesis where the
 7    conclusion did not affirm the hypothesis;
 8    correct?
 9                     MR. BRAVE:  Objection to
10                form.
11                     THE WITNESS:  I can't think
12                of anything like that to say as a
13                medical examiner.  More to say when
14                I was in pure research in medical
15                school, for example.  It certainly
16                happened then.
17                     Oh, I take that back.  The
18                abstract you were referring to before
19                where Dr. Reval, R-e-v-a-l, was the
20                senior author.  That study was
21                specifically looking to find the
22                terminal cardiac rhythm.  We thought
23                that it was going to be ventricular
24                fibrillation.  The study proved it was
25                not ventricular fibrillation.  It
```

                        Wetli, M.D.

2          proved that it was something else.

3      Q      What was that?

4      A      Asystole or false electrical

5   activity.

6      Q      How many articles have you

7   published, hundreds?

8      A      Approximately 120.

9      Q      And is that the only one you

10  recall that happening to you?

11     A      That's the only one that comes to

12  mind.  If I went back and looked, I might find

13  more.

14     Q      But that would be very few?

15     A      Because of the nature of the type

16  of research that we're doing, yes.

17     Q      And that's because you do a

18  retrospective study?

19     A      That's correct.

20     Q      You collect your data and

21  interpret your data, and then you make you

22  hypothesis?

23     A      Or hypothesis can stem from that,

24  from those data and those conclusions, yes.

25     Q      Do you recall the publication that

```
1                       Wetli, M.D.

2    in March of 2004 in the American Journal of

3    Forensic Medicine and Pathology with you and

4    Deborah Mash and others entitled "National

5    Association of Medical Examiners' Position Paper

6    on the Certification of Cocaine-Related Deaths?"

7          A       Correct.  Yes.

8          Q       And in that publication, you make

9    certain recommendations of medical examiners

10   nationally; isn't that true?

11         A       True.

12         Q       And your goal or one of your goals

13   is to provide consistency in the diagnosis of

14   the cause of death; is that correct?

15         A       Correct.

16         Q       And in that paper, you make the

17   statement, do you not, that the previous surveys

18   upon the subject have documented an inconsistent

19   pattern of interpretation of the data by various

20   medical examiners practicing in the field?

21         A       Correct.

22         Q       Now, in this paper, you make no

23   consideration, do you, that police misconduct

24   even contributed to the death?

25         A       I don't recall, but that's always
```

1                    Wetli, M.D.

2   a consideration any time you have a death in

3   police custody.

4         Q      But in the document itself, you do

5   not advise your medical examiners to rule out

6   police misconduct as even a contributory cause

7   of death; isn't that true?

8         A      I really don't recall.  It

9   probably would not be the proper place to put

10  that kind of a statement in a position paper on

11  cocaine death certification.

12        Q      Well, in the cases where there has

13  been a fatality and associated cocaine use,

14  there are often, as with Melinda Fairbanks, an

15  indication of violence; isn't that true?

16                    MR. BRAVE:  Objection to

17             form.

18                    THE WITNESS:  That can be,

19             yes.

20        Q      Bruising?

21        A      Yes.

22        Q      Maybe head trauma?

23        A      True.

24        Q      Choke holds?

25        A      Correct.

1                           Wetli, M.D.

2           Q      It your understanding in the

3    history of Melinda that she was binging?

4           A      Not in the history.  I never got

5    that as far as history was concerned.

6           Q      You understand that she was

7    working the day before?

8           A      I don't recall that.

9           Q      Well, what is your understanding

10   in reaching your conclusions about Melinda's

11   methamphetamine use?

12          A      I couldn't tell you.

13          Q      The 1996 paper conducted or the

14   research conducted by Mash, Karsh and you

15   entitled Cocaine-Associated Agitated Delirium

16   and the Neuroleptic Malignant Syndrome."  do you

17   recall that paper?

18          A      Yes.

19          Q      Again, in that paper, you began

20   with the premise that police conduct did not

21   contribute to the death; isn't that correct?

22          A      Correct.

23          Q      And, in fact, in the article or in

24   the publication, you state frivolous speculation

25   about the cause or mechanisms of death will only

```
 1                      Wetli, M.D.

 2    invite needless litigation?

 3           A     True.

 4           Q     Dr. Wetli, you coined the phrase

 5    excited delirium in about 1985; is that correct?

 6           A     No.

 7           Q     You did not?

 8           A     No.

 9           Q     Isn't delirium the recognized

10    condition by the American Psychiatric

11    Association, not excited delirium?

12           A     I have no idea what the American

13    Psychiatric Association recognizes or not.   In

14    their DSM diagnostic manual, they talk about

15    delirium and its various manifestations, but

16    they do not use the term excited delirium.

17    Excited delirium is found also in the

18    psychiatric literature.

19           Q     And the American Medical

20    Association also doesn't recognize it as the

21    condition as excited delirium, only delirium;

22    isn't that correct?

23           A     I have no idea, and I really don't

24    care.   It's a political organization.

25           Q     Dr. Mash and you, along again with
```

```
 1                    Wetli, M.D.
 2   Steven Karch and a couple of other physicians
 3   wrote another paper, "Criteria for the
 4   Interpretation of Cocaine Levels in Human
 5   Biological Samples and Their Relationship to the
 6   Cause of Death," recently published in 2004.  Do
 7   you recall that?
 8         A     Yes.
 9         Q     Again, the premise does not
10   include Tasers or police misconduct as a
11   contributory factor, does it?
12         A     No.  It did not address those
13   issues.
14         Q     Doctor, for a jury, would you
15   define rhabdomyolysis?
16         A     The breakdown of skeletal muscle.
17         Q     And how does it manifest itself,
18   acidosis?
19         A     No.  It will manifest itself by
20   the increase of a protein in the blood called
21   myoglobin, which is similar to hemoglobin but a
22   larger molecule.  That, in turn, will interfere
23   with kidney function.
24               And if the rhabdomyolysis is severe
25   enough, then you can go into acute kidney failure
```

```
 1                     Wetli, M.D.
 2     and then eventually into disorders of coagulation
 3     and multi-organ failure and death.
 4          Q     And both skeletal muscle activity
 5     and hypothermia are prominent features of
 6     excited delirium?
 7                          MR. BRAVE:  Objection.
 8               Form.
 9                          THE WITNESS:  It depends.
10               Rhabdomyolysis is invariably found
11               when the person has a cardiac arrest
12               and then is resuscitated.  In
13               non-fatal cases, the rhabdomyolysis
14               may also become evident as well if
15               they make it to the hospital.
16                    Hyperthermia is frequently
17               seen with cocaine-induced excited
18               delirium, but it's not part of the
19               diagnostic criteria.  Cases of excited
20               delirium do occur without the
21               hypothermia.
22          Q     Maybe I didn't read your article
23     correctly, but in it there is a statement that
24     both skeletal muscle activity and hypothermia
25     are prominent features of ED.
```

```
 1                        Wetli, M.D.

 2          A       What article is that?

 3          Q       This is the fatal excited delirium

 4   following cocaine use.

 5          A       Following cocaine use, they're

 6   frequent, yes.

 7          Q       Are you familiar with Dr. Dennis

 8   Valentino and a number of others' study in 2006

 9   on in-custody deaths associated with the Taser

10   26 discharges, and they did a study with swines

11   and concluded severe metabolic and respiratory

12   acidosis suggest involvement of a primary

13   cardiovascular mechanism?

14          A       I heard of that, yes.

15          Q       Have you read the article?

16          A       I may have.  I don't recall.

17   There have been a number of studies using swine

18   and Tasers.

19          Q       Well, as we've agreed before,

20   under most circumstances, you can't repeatedly

21   shoot individuals multiple times over long

22   periods of time, humans, and then do these

23   studies; correct.

24          A       Correct.

25          Q       In other words, if you are looking
```

```
 1                    Wetli, M.D.
 2   to see whether or not deaths occur due to
 3   ventricular fibrillation as a result of multiple
 4   prolonged Taser discharge, you're not going to
 5   shoot a human repeatedly to see if they die;
 6   correct?
 7        A      Correct.
 8        Q      Do you have an opinion about the
 9   conclusions reached in this study?
10        A      Do I have an opinion, yes.
11        Q      And what is that?
12        A      Tasers can be dangerous to pigs.
13        Q      But you don't think they're
14   dangerous to humans?
15        A      No.
16        Q      Have you ever been tazed?
17        A      No.
18        Q      You would agree, would you not,
19   that most studies or a significant number of
20   studies performed are prior to the authorization
21   of the use of, say, drugs or medical devices are
22   performed first on animals?
23                    MR. BRAVE:  Objection.
24              Form.
25                    THE WITNESS:  They
```

```
1                      Wetli, M.D.

2              frequently are, yes.

3         Q     And because Tazer was considered a

4    weapon instead of a medical device, Taser did

5    not have to undergo the same rigorous types of

6    scientific studies about its safety than say a

7    defibrillator would have to go through; isn't

8    that true?

9         A     I have no idea.  I wold think that

10   they would have to go through legal scrutiny and

11   scientific disciplines as anybody, like a drug,

12   for example.

13        Q     So you really don't know the

14   history of what types of studies, if any, that

15   Taser underwent before they put it in the market

16   in 1999?

17        A     I read material, but it's not

18   something that I went into in a lot of detail.

19        Q     Have you ever been involved in

20   getting approval for a medical device such as a

21   defibrillator on the market?

22        A     No.

23        Q     Or any medical device on the

24   market?

25        A     No.
```

1                          Wetli, M.D.

2          Q       Have you ever been involved in

3     getting approval for a drug to be released on

4     the market?

5          A       No.

6          Q       In your studies, do you keep your

7     data, your raw data?

8          A       Yes, usually for a couple of

9     years.

10         Q       Are you familiar with the study

11    published in the Journal of American College of

12    Cardiology in 2006 that cardiac

13    electrophysiological consequences of

14    neuromuscular incapacitated device discharges by

15    Nanthakumar, Billingsly, and a number of other

16    physicians?  Would you like to take a look?

17         A       Yes, may I see that, please.  I

18    may have seen this.  This is another one of the

19    big studies.

20         Q       So you don't have a lot of respect

21    or confidence in conclusions reached by studies

22    where pigs have been used as the experimental

23    model?

24                 MR. BRAVE:  Objection.

25             Form.

```
1                          Wetli, M.D.
2                    THE WITNESS:  As far as
3               electrical stimulation of the heart
4               and so forth, no, I don't.  I think
5               that there is a human experience out
6               there which is a lot more extensive
7               that has to be more relied on more
8               frequently than pigs.
9         Q     Well, you agree, would you not,
10   that retrospective studies, medical records and
11   autopsies have their limitations because they're
12   not always accurate and they're often
13   incomplete?
14        A     And that's the same that can be
15   said with animal models.
16        Q     And that's the same that can be
17   said of computer models?
18        A     Of course.  If you have to choose
19   the correct models, and my understanding is that
20   a pig is not necessarily the correct model to
21   use for evaluating electrical effects on the
22   human heart.
23        Q     Well, you would prefer an ape or
24   orangutan?
25        A     I don't know because I think it
```

```
 1                    Wetli, M.D.

 2    would take somebody who would know how the

 3    conduction system of the heart works and how

 4    sensitive they are to fibrillation and so forth.

 5    Is there one model that is similar to the human

 6    enough.

 7         Q    Dr. Wetli, what we're really

 8    getting at in all of this is there certainly

 9    needs to be more consideration, would you not

10    agree, about cardiac risk and other risk in

11    humans, particularly with repeated prolonged use

12    of the Taser?

13                    MR. BRAVE:  Objection.

14               Form.

15                    THE WITNESS:  As far as I

16               can tell, those studies are being

17               conducted and have been conducted in

18               humans.

19         Q    But isn't it true that up until

20    2005 that Taser controlled the data and the

21    research in this area?

22                    MR. BRAVE:  Objection.

23               Form.

24                    THE WITNESS:  I have no

25               idea.
```

```
1                    Wetli, M.D.

2        Q    Well, you are aware, are you not,

3  Dr. Wetli, that it has only been recently with

4  the some 150, 200 deaths which have been

5  temporally related to the Taser usage that

6  independent studies have been conducted that

7  were not funded by Taser International?

8                    MR. BRAVE:  Objection.

9            Form.

10                   THE WITNESS:  I'm not

11            familiar with that, no.  I'm sure

12            that there are studies that have

13            been done by Taser that are funded

14            by Taser.  I know there were studies

15            that were done on Taser that were

16            not funded by Taser.

17                   I would imagine that these

18            would be stemming from

19            lawsuits resulting from -- not from

20            lawsuits but deaths resulting --

21            occurring shortly after the

22            application of Taser.  We have the

23            same exact thing happening with pepper

24            spray, so that wouldn't be surprising,

25            but I don't know the dates.
```

```
1                          Wetli, M.D.

2            Q      Do you know Robert Streppa?

3            A      No.

4            Q      Do you know Max Neurheim?

5            A      No.

6            Q      Do you know James Brewer?

7            A      No.

8            Q      Wayne McDaniel?

9            A      No.

10           Q      Did you know a former employee of

11    Taser that's recently been sued, a Mark Johnson?

12           A      No.

13           Q      He was apparently involved in some

14    of the research with Dr. Ho and Dr. Dawes.  So

15    you don't recall meeting him when you may have

16    had an association or meeting or conference with

17    these other two doctors?

18           A      No.  I don't recall the name.

19           Q      With respect to the scientific

20    methodology that was used in what we're labeling

21    Plaintiff's Exhibit No. 234, other than the fact

22    that you do not believe the subject pigs is

23    necessarily a valid subject to reach certain

24    conclusions about humans, was there anything

25    else in that scientific paper that you consider
```

                        Wetli, M.D.

1  to have limitations?

2          And I'm looking at the scientific

3  method of how they conducted their study and

4  reached their conclusions.

5      A    Well, I can't really address that

6  because I'm not that clearly familiar with it,

7  but I think it's interesting that the reason

8  they used the pig is because other studies have

9  used the pig.  That doesn't mean it's the right

10  model.

11      Q    But aside from the pig, at least

12  as we sit here today, you cannot tell me of

13  anything else that you consider a shortcoming

14  with respect to the scientific methodology?

15      A    Let me see if this is the one that

16  I'm thinking of.  Just from what I gathered, I

17  can't really say anything more about it except

18  that planting a dart in a subcutaneous area has

19  little to do with the human condition.

20      Q    Let me show you Exhibit No. 191

21  which, which we basically talked about as well,

22  in which, again, pigs were used, and they

23  concluded that the severe metabolic and

24  respiratory acidosis seen suggested primary

```
 1                    Wetli, M.D.
 2    involvement of primary cardiovascular mechanism.
 3                 Aside from the fact that you do not
 4    agree with the subject, visa vis the pigs, can you
 5    tell me if there is anything else about the
 6    scientific method and conclusions reached that you
 7    disagree with concerning Dr. Dennis and Valentino
 8    and these other medical doctors' scientific study?
 9         A    No.  I think it accurately
10    portrays what is going to happen to an
11    anesthetized pig.
12         Q    Dr. Wetli, in your paper, going
13    back to the one where we discussed briefly the
14    conclusions, fatal excited delirium following
15    cocaine use, a study again with you and
16    Deborah Mash and some others.  In the abstract,
17    it states that the epidemiologic findings are
18    most consistent with the hypothesis that chronic
19    cocaine use disrupts dopaminergic function.  And
20    when coupled with recent cocaine use may
21    precipitate agitation, delirium, abhorrent
22    thermoregulation rhabdomyolysis and sudden
23    death.  Again, you interpreted certain data to
24    make this hypothesis?
25         A    And draw those conclusions, yes.
```

Wetli, M.D.

1

2      Q      And draw those conclusions?

3      A      Yes.

4      Q      And you would agree, would you

5  not, that qualified experts may legitimately

6  disagree with your data in which you reach that

7  hypothesis and conclusion?

8                 MR. BRAVE:  Objection.

9           Form.

10                THE WITNESS:  No, I don't

11           think they would necessarily

12           disagree with the data.  They might

13           disagree with the interpretation of

14           it.

15     Q      Yes, that's more precise.  Thank

16  you.  Doctor, are you representing that the

17  hemorrhage as shown in Medical Examiner Photo

18  No. 166 is near where the jugular venous

19  catheter was inserted?

20     A      Well, in that vicinity, yes.

21     Q      Where in that vicinity?

22     A      Right over the bruises, just a

23  little bit forward maybe.

24     Q      How far from where the hemorrhage

25  is?

```
 1                          Wetli, M.D.
 2          A       Coming right down this area.
 3          Q       So you disagree with Dr. Gowitt
 4   when he says it's not close, where the catheter
 5   was inserted simply is not close to where this
 6   resulted injury is?
 7          A       Yes, I would say that this could
 8   be as a result of the catheter.  It might be due
 9   to other things.
10          Q       And what other things could it
11   also be a result of, a choke hold, perhaps?
12          A       No.  A choke hold, a lateral
13   vascular neck restraint or a punch could do it.
14                      MR. BLEDSOE:  Objection to
15              form.
16          Q       Doctor, Dr. Wetli, I'm going to
17   show you some photographs that were described in
18   Dr. Gowitt's deposition but which have not been
19   provided to you.  These were photographs taken
20   by the medical examiner.  They're referenced in
21   groups in his deposition.
22                      They were referenced as Defendant's
23   Exhibits, for example, 24-01 through 24-12, which
24   were the head injuries.  I'm going to show you
25   these photographs.  The only difference is that
```

```
 1                      Wetli, M.D.
 2   there's a white label that just says exhibit,
 3   without referencing a party.
 4                      First, I want to show you Exhibit
 5   No. 24-01 through 24-12.  Can you tell me, please,
 6   what injuries that you, as a forensic pathologist,
 7   can diagnose from those photographs, if any?
 8           A      I'm not sure I understand your
 9   question.
10           Q      What injuries are shown by those
11   photographs?
12           A      Basically, abrasions and
13   contusions.
14           Q      To the brain?
15           A      There's one area of bleeding in
16   the right subarachnoid space and the right
17   occipital lobe.
18           Q      And for the jury, that's the
19   brain?
20           A      Yes, the back of the brain on the
21   right side close to the top.
22           Q      And as a forensic pathologist,
23   what types of trauma or force may cause that
24   type of injury that you see in those
25   photographs, those injuries?
```

```
 1                    Wetli, M.D.

 2        A      These are all blunt-force

 3   injuries, contusions and abrasions.

 4        Q      Can they be caused from taking the

 5   head and ramming it against the ground?

 6                    MR. WILLIAMS:  Object to

 7             form.

 8                    THE WITNESS:  Some of them

 9             could be, sure.

10        Q      Can it be caused by taking the

11   head and ramming it against the door frame of a

12   car?

13        A      Sure.  Some of them, anyway.

14        Q      Let me show you what has been

15   marked as Exhibit No. 26-1 through 26-5.

16                    (Whereupon, at 11:19 a.m., a

17             recess was taken to 11:30 a.m.)

18                    (The deposition resumed with

19             all parties present.)

20   C H A R L E S   W E T L I, M. D.,     resumed

21        and testified further as follows:

22   BY MS. FRAZIER:

23        Q      Dr. Wetli, I have shown you some

24   photographs, medical examiner photographs, that

25   were presented in Dr. Gowitt's deposition of the
```

1                      Wetli, M.D.

2    upper extremities.   I believe they're all the

3    upper extremities.   No.   That's the lower

4    extremity.

5                      I don't remember how he grouped

6    them, so I won't represent them to be that.

7    They're labeled, for our purposes today, 26-01

8    through 26-05.   Can you tell me what injuries are

9    shown on those photographs?

10           A      Predominantly contusions to the

11   left shoulder, left arm, looks like the right

12   knee and inner portion of the thigh, the left

13   forearm, the back of the left hand and back of

14   the forearm, which also has some abrasions.

15           Q      And contusions and abrasions, for

16   a jury, bruises and cuts?

17           A      No.   Bruises and scrapes.

18           Q      And would you agree that the

19   injuries to the wrist are consistent with

20   handcuffs?

21           A      Yes.

22           Q      And are the bruises to some

23   portions of the body, could they be consistent

24   with the use of a billy club or some type of

25   club?

```
 1                        Wetli, M.D.
 2                   MR. BRAVE:  Objection.
 3             Form.
 4                   MR. WILLIAMS:  Objection.
 5             Form.
 6                   THE WITNESS:  These bruises
 7             are all nonspecific.  I do not see
 8             any pattern of injuries that would
 9             be consistent with being struck with
10             a quote, unquote, billy club.  They
11             could be, but there is nothing to
12             suggest that particular pattern
13             here.  The only pattern injury is to
14             the abrasions to the wrist, which
15             would indicate struggling against
16             the handcuffs.
17        Q    Were you aware that when the Taser
18   was applied that Melinda was under arrest in the
19   back seat of a patrol car with her handcuffs
20   behind her back and shackled, her ankles
21   shackled?
22                   MR. BRAVE:  Objection to
23             form.
24                   THE WITNESS:  Yes.
25        Q    What types of trauma, in your
```

1                    Wetli, M.D.

2    opinion, would result in nonspecific bruising

3    such as that shown in those photographs before

4    you?

5         A    All you can say is that it

6    requires blunt force trauma.  It cold be

7    self-inflicted.  It could be by somebody else,

8    either kicks, punches, falls, anything.

9         Q    Let me show you what's been marked

10   as 27-01 through 27-08.  Again, these are some

11   additional photographs that were taken by the

12   medical examiner and referenced in Dr. Gowitt's

13   deposition but which have not been produced to

14   you, except perhaps there was one in there that

15   may be one of the photographs of the neck area.

16              Again, for the jury, can you

17   describe those injuries?

18        A    These are all predominantly

19   contusions, and in one or two areas, you also

20   have some abrasions.

21        Q    Again, we're talking about for a

22   jury, bruises and scrapes?

23        A    Correct.

24        Q    And can you tell me are there any

25   patterns in those photographs that you would

```
 1                     Wetli, M.D.
 2   associate with certain types of trauma?
 3        A      In 27-06 and 27-07, you have some
 4   parallel contusions with central area of
 5   clearing, which would be consistent with being
 6   struck with a smooth, round, object, like a pool
 7   queue, billy club.
 8                We would have to see the type of
 9   instrument, but that type of impact.  And the
10   photograph also 27-03 has an area that is also
11   suggestive of that.
12        Q      Of a billy club-type instrument?
13        A      Well, a smooth, round object.  It
14   could be a pool queue, axe handle, hammer
15   handle, billy club.
16        Q      Well, with respect to the types of
17   equipment that police may have as usual and
18   customarily-issued weaponry, it would be the
19   billy club, correct, not a hammer?
20                     MR. WILLIAMS:  Object to the
21                form of the question.
22                     THE WITNESS:  Today, billy
23                clubs aren't used.  I haven't seen
24                billy clubs in a while, but
25                something like an expandable baton
```

```
 1                    Wetli, M.D.

 2              like an asp.

 3        Q      And then the last photograph,

 4   Doctor, I believe, is just another photograph of

 5   the neck area?

 6        A      Yes.

 7        Q      That we discussed previously.  And

 8   I believe you agreed that that injury could be

 9   consistent with or caused by some type of

10   restraint to the neck?

11        A      Correct.

12        Q      Let me show you what's been marked

13   as Plaintiff's Exhibit No. 28-1 through 28-A.

14   Again, these were additional medical examiner

15   photographs that were discussed in Dr. Gowitt's

16   deposition.  What injuries are in those

17   photographs?

18        A      These are photographs

19   predominantly of the lower extremities revealing

20   numerous contusions and abrasions, so bruises

21   and scrapes.

22        Q      Can you tell me whether or not the

23   injuries of the ankles are consistent with the

24   shackles on her legs?

25        A      This is consistent with struggling
```

```
1                    Wetli, M.D.

2  against the hobble restraints, yes.

3          Q      Do you see any pattern-type

4  injuries on those photographs?

5          A      The ones that are consistent with

6  the hobbles around the ankles, yes.

7          Q      Other than that, sir?

8          A      No.  They're all nonspecific.

9  They're individual bruises that could have been

10  sustained any number of ways.

11         Q      And as a medical examiner, you

12  could not rule out the bruising and abrasions

13  being as a result of force by the police; isn't

14  that true?

15         A      I couldn't tell you how she got

16  them, no.

17         Q      Dr. Wetli, would you agree

18  electrical burns are a function of time and

19  temperature?

20         A      To a certain extent, yes.

21         Q      Let me show you that's been marked

22  as Exhibit 29-01 through 29-04.  Again, these

23  are photographs that Dr. Gowitt discusses and

24  that were taken by the medical examiner.

25         A      Okay.
```

                           Wetli, M.D.

1

2        Q      What injuries do you see there?

3        A      Well, one of them looks like an

4    electrical injury to the breast, two of them.

5    And then it looks like another one which looks

6    more like a defibrillator paddle mark.

7        Q      Not looking at the defibrillator

8    paddle, which obviously was an attempt to save

9    Melinda's life, and I think we can stipulate

10   that that's correct.

11              But nevertheless, I will stipulate

12   that that is not an injury that is caused by

13   someone that wasn't interested in trying to save

14   her life.  As to the other burns, have you ever

15   seen Taser burns that look like that?

16       A      They're a little larger than the

17   ones I'm used to seeing.  Then again, she

18   survived for a number of hours as well, so

19   that's about as far as I can go with that.

20       Q      Do you recall that the data port

21   indicated on the Taser weapon that the GBI

22   actually knew about and inspected at least 13

23   discharges over 22 minutes?

24       A      Correct.

25       Q      And do you know, in general, how

```
 1                    Wetli, M.D.

 2    the M26 operates, the M26 Taser operates?

 3         A    In general, yes.

 4         Q    Are you aware that once the

 5    trigger is pulled and the electricity

 6    discharged, that the data port does not

 7    accurately record all the entire length of time

 8    that the electricity is emitting into the body?

 9                    MR. BRAVE:  Objection to

10              form.

11                    THE WITNESS:  I don't know

12              that.

13         Q    With respect to your expertise,

14    you would not then have an opinion as to how

15    much time and temperature it took to result in

16    the second-degree burns that we see, for

17    example, in 29-01?

18         A    That's correct.  I would not opine

19    anything about that, no.

20         Q    You would agree, would you not,

21    that second-degree burns are very painful?

22                    MR. BRAVE:  Objection.

23              Form.

24                    THE WITNESS:  They can be,

25              yes.
```

1               Wetli, M.D.

2       Q       Would you agree with the Taser

3   literature that would indicate that the Taser

4   can be used as a pain compliance weapon?

5       A       Yes.

6       Q       Let me show you what's been marked

7   as Exhibit No. 25-01 through 25-07.  And it's

8   been Bates stamped 596 through 602.  I'll

9   represent that these are the coroner photographs

10  taken at the hospital immediately after death or

11  during the time she was being pronounced dead.

12              I don't want to stipulate exactly

13  the time frame, but they were at the hospital and

14  they were taken by the coroner.  Perhaps I should

15  be a little more careful on that.

16              Are there any injuries that we have

17  previously discussed that are reflected on those

18  photographs that -- excuse me.  Let me rephrase

19  this.  Are there any injuries reflected on those

20  photographs that we haven't already discussed?

21      A       Not that I can see, no.

22      Q       Let me show you a couple of

23  photographs that were taken by Lieutenant Storey

24  on the scene and produced by the deputies'

25  attorneys to us.  We labeled them Plaintiff's

```
1                     Wetli, M.D.

2    Exhibit No. 199 and Plaintiff's Exhibit No. 200.

3                     Now, I'm assuming, Dr. Wetli, you've

4    never seen those photographs either?

5         A    Correct.

6         Q    Do you have any special training

7    or education that would enable you to determine

8    whether the expression on her face is fear,

9    anger, or what emotions and/or feelings she may

10   be experiencing while she's being photographed?

11        A    No, I have no idea.

12        Q    And if the testimony has been that

13   these are the Taser wires being shown and you

14   can see a bit of the gun reflected or shown in

15   the photographs, you have no reason to believe

16   that that's not photographing her one way or the

17   other while she's being tazed, to you?

18        A    I can't tell anything from the

19   photograph, no.

20        Q    Dr. Wetli, most of your work has

21   been done through retroactive studies with

22   individuals that have consumed cocaine; is that

23   correct?

24        A    Retrospective studies, yes.

25        Q    I thought I said that, but maybe I
```

```
 1                     Wetli, M.D.

 2     didn't.  Of course, Melinda was using

 3     methamphetamine, but am I correct that these are

 4     both stimulants?

 5          A     Correct.

 6          Q     Now, the pharmacologic

 7     differences, as I understand it, and I'm asking,

 8     too, is cocaine has been useful as an

 9     anesthetic.

10          A     Local anesthetic, yes.

11          Q     Methamphetamine is related to

12     amphetamines; correct?

13          A     Correct.

14          Q     And it has not been used as an

15     anesthetic; correct?

16          A     Correct.

17          Q     That has been used to treat ADHD,

18     obesity, and narcolepsy?

19          A     I believe so, yes.

20          Q     You would agree, you would not,

21     Dr. Wetli, that the application of a Taser

22     discharge to Melinda multiple times over a

23     prolonged period of time certainly wasn't good

24     for her; can we agree to that?

25          A     Good in what way?
```

```
 1                    Wetli, M.D.

 2        Q     Well, it didn't helper any?

 3        A     I presume it didn't.  As I

 4   understand, she did not respond to it.

 5        Q     Well, while you may be disagreeing

 6   with Dr. Gowitt that the deployment of the Taser

 7   contributed to her death, you're not saying that

 8   the deployment of the Taser was in any manner

 9   helpful?

10        A     No.  I don't think it did anything

11   to her one way or the other, except create the

12   marks on her chest.

13        Q     Except for the burns?

14        A     Right.

15        Q     Well, you're not suggesting that

16   she got the burns any other way, are you?

17        A     No.

18        Q     Have you ever had second-degree

19   burns to your nipple area?

20        A     No.

21        Q     Have you ever had done any

22   experiments, either retroactively or discussed

23   with women, what type of pain level they may

24   have with injuries to their breasts?

25        A     No.
```

1                          Wetli, M.D.

2          Q      You concluded or made a statement,

3    maybe more accurate, that the first EMS that

4    arrived at the scene determined there was no

5    medical emergency.  Do you recall that

6    statement, sir?

7          A      Yes.

8          Q      Could you tell me what vital signs

9    were recorded in any patient care report

10   completed by the paramedic Sainthill to support

11   that determination?

12         A      I believe she was being too

13   violent to take vital signs, so they didn't take

14   them.

15         Q      You have not been provided Venetta

16   Hollander's EMS report, have you -- I mean her

17   expert report on pre-hospital emergency

18   medicine?

19         A      No, I have not seen that.

20         Q      You would defer, would you not, to

21   the experts on whether or not the experts in

22   pre-emergency medicine as to whether or not

23   there was appropriate medical care provided on

24   the scene by the paramedics?

25                    MR. BRAVE:  Objection.

1                        Wetli, M.D.

2              Form.

3                        THE WITNESS:  That is beyond

4              my area of expertise to judge it one

5              way or the other.  I would have to

6              defer to others to determine how

7              appropriate or inappropriate it was.

8          Q    I'll just ask you some of these

9    questions.  And if you have no opinion, of

10   course, I'll understand.  But assume that

11   Venetta Hollander, who is currently the Catoosa

12   County coroner, but who is a licensed paramedic

13   and has taught at the Chattanooga State

14   Technical Community College, other individuals

15   for certification for quite a number of years,

16   since the '80s.

17             She is currently employed, in

18   addition to a coroner, as a paramedic for Hamilton

19   County, which is the city of Chattanooga,

20   Tennessee.  She has reached certain expert

21   opinions on the professional acts and omissions of

22   the paramedics at the scene.

23             She states that the scene was safe

24   for the EMS but not safe for the patient,

25   Melinda Fairbanks.  Do you have an opinion?

```
 1                    Wetli, M.D.
 2                    MR. BLEDSOE:  Object to
 3          form.
 4                    MR. BRAVE:  Join.
 5                    THE WITNESS:  No opinion.
 6      Q     She states that an EMS is trained
 7   to transport if there is any index of suspicion
 8   of medical or traumatic emergency.  Do you have
 9   any opinion?
10                    MR. BLEDSOE:  Object to
11          form.
12                    MR. BRAVE:  Join.
13                    THE WITNESS:  I have no
14          opinion what the training of
15          paramedics entails.
16      Q     She opines that the paramedic's,
17   Sainthill's history, showed an individual that
18   was hostile and prejudiced to both law
19   enforcement and to combative patients that
20   compromise his qualifications as a first
21   responder.  Do you have an opinion?
22                    MR. BLEDSOE:  Object to
23          form.
24                    THE WITNESS:  No opinion.
25      Q     You were not provided any of the
```

1                      Wetli, M.D.

2   personnel records, including the disciplinary

3   file on Paramedic Sainthill, if I understand

4   correctly?

5        A    That's correct.  I have never seen

6   any personnel records.

7        Q    She states further that EMS

8   personnel are trained to handle combative

9   patients regardless of the mechanism that caused

10   the patient to have an altered mental status.

11   Do you have any opinions about that?

12                 MR. BLEDSOE:  Object to

13             form.

14                 THE WITNESS:  Again, I have

15             no idea what the paramedics are

16             trained to deal with.

17        Q    The only reason I'm going through

18   this, Dr. Wetli, of course, is there has been a

19   statement made that this paramedic made a

20   certain determination on the scene that there

21   was no medical emergency.

22                 She opines further that Whitfield

23   Emergency Medical Services EMS violated the

24   already-established standard of care with this

25   patient having been successfully transported in

```
 1                         Wetli, M.D.

 2    the past and recovering successfully.  No opinion?

 3            A     No opinion.  I have no idea what

 4    the standard of care is.

 5            Q     Mrs. Hollander states that due to

 6    Melinda Fairbanks's obviously confused and

 7    disoriented state, she could not and did not

 8    refuse treatment or transport.  Do you have any

 9    opinion, Dr. Wetli?

10                     MR. BLEDSOE:  Object to the

11                 form.

12                     THE WITNESS:  I have no

13                 opinion.

14            Q     Ms. Hollander opines as an expert

15    in pre-hospital medical care that paramedics are

16    trained to assess and have the patient in an

17    ambulance within ten minutes.  Do you have any

18    opinion on that and their training?

19                     MR. BLEDSOE:  Object to

20                 form.

21                     THE WITNESS:  No.

22            Q     Would you agree, Dr. Wetli, that a

23    patient exhibiting excited delirium symptoms

24    needs medical treatment as quickly as possible?

25                     MR. BLEDSOE:  Object to
```

```
 1                      Wetli, M.D.

 2              form.

 3         Q     To increase their chance of

 4    survival?

 5                      MR. BRAVE:  Join the

 6              objection.

 7                      THE WITNESS:  As I mentioned

 8              earlier, if you recognize it as

 9              excited delirium, the answer is yes.

10         Q     Ms. Hollander opines that if

11    paramedic Sainthill believed his patient was

12    safer in the back of a patrol car, then he made

13    life-threatening decisions and is responsible

14    for her death.  Do you have an opinion about

15    that?

16                      MR. BLEDSOE:  Objection to

17              form.

18                      THE WITNESS:  I have no

19              opinion about that.

20         Q     She further states that paramedic

21    Sainthill was not fit to perform his job based

22    upon his prior history.  I see you have no

23    opinions, since you've agreed that you're not an

24    expert in pre-hospital medical care?

25                      MR. BLEDSOE:  Object to
```

1                        Wetli, M.D.

2              form.

3                        THE WITNESS:   And I have no

4              idea what Sainthill's history is.

5        Q     Again, I would ask you, Dr. Wetli,

6   with respect to whether or not the EMS

7   appropriately determined there was no medical

8   emergency, you're not giving an expert opinion

9   on that; correct?

10       A     That is correct.

11       Q     Dr. Wetli, do you know whether or

12  not the American Red Cross has promotional

13  material and/or educates individuals that heat

14  stroke is a life-threatening event and needs

15  immediate emergency care?

16       A     I don't know anything about the

17  American Red Cross in that regard.  I know they

18  have promotional materials, but I don't know if

19  it's specifically in relation to heat stroke or

20  concerning heat stroke.  I have no idea.

21       Q     Do you know what education and

22  training that law enforcement is standard for

23  law enforcement with respect to the heat stroke

24  or the possibility of heat stroke and prompt

25  emergency care?

                              Wetli, M.D.

1

2        A     I have no idea.

3        Q     Well, let's get to you.  As a

4    medical doctor, educated and trained medical

5    doctor, do you consider heat stroke a potential

6    life-threatening emergency?

7        A     Yes.

8        Q     Doctor, if you assume that the

9    Taser weapon or the electronic control device,

10   these discharges, aggravated the release of

11   catecholamine, if you assume that to be true,

12   you would agree, would you not, that the Taser

13   weapon contributed to Melinda's death?

14                    MR. BLEDSOE:  Object to the

15              form.

16                    MR. BRAVE:  Join.

17                    THE WITNESS:  If I assume

18              that it -- no, I would not.

19       Q     But you do agree that an increase

20   in catecholamines increases the heart rate?

21       A     Yes.

22       Q     And does it increase the body

23   temperature?

24                    MR. BRAVE:  Objection form.

25                    THE WITNESS:  I don't know

```
 1                    Wetli, M.D.
 2           that it increases bodies
 3           temperature.  It increases
 4           metabolism.
 5      Q    You are not advocating any
 6 opinions here today, Dr. Wetli, that it was
 7 appropriate or authorized for the police to have
 8 used a Taser against Melinda while she was
 9 already under arrest, handcuffed, and shackled
10 in the back of a police car, are you?
11                MR. BRAVE:  Objection to
12           form.
13                THE WITNESS:  I'm not an
14           expert in police tactics.
15      Q    In Heston versus the City of
16 Salinas and Taser International, you concluded
17 that the Taser did not contribute to her death
18 in that as well?
19      A    Correct.
20      Q    If I understand correctly, I think
21 that there was not an issue of the
22 redistribution of the methamphetamine in Heston;
23 correct?
24      A    I don't recall, but I believe
25 that's correct.
```

```
1                     Wetli, M.D.
2         Q     And they had actually tested the
3    brain tissues or Dr. Mash had an opportunity to
4    examine brain tissue samples in Heston?
5         A     I believe that's correct.
6         Q     In our case, you agree with
7    Dr. Gowitt, do you not, that the redistribution
8    of the drugs postmortem or the methamphetamine
9    postmortem and the fact that the autopsy
10   was --or the drug samples were taken centrally,
11   invalidates the results?
12                    MR. BLEDSOE:  Objection to
13               form.
14                    MR. BRAVE:  Join.
15                    MR. WILLIAMS:  Object to
16               form.
17                    THE WITNESS:  No, that is
18               not correct.  It makes the
19               quantification somewhat meaningless,
20               but the quantitative assessment is
21               valid.
22        Q     In other words, we agree that she
23   had methamphetamine.  We just don't know how
24   little or how much?
25        A     Exactly.
```

                          Wetli, M.D.

1

2          Q       In the Heston case, there was also

3    multiple Tasers and multiple deployments over a

4    prolonged period of time; would you agree?

5          A       I don't recall.  I don't recall

6    those details right now.  I haven't reviewed

7    that case since the deposition.

8          Q       Do you recall whether or not you

9    were provided the autopsy photographs in the

10   Heston case?

11         A       I don't recall.

12         Q       Have you ever discussed with

13   Dr. Ho his opinion about the pain level

14   experienced with a Taser discharge involving 1.5

15   seconds?

16         A       I've never discussed that with

17   him, no.

18         Q       You wouldn't have any reason to

19   disagree with, assuming that he testified under

20   oath, that on a scale of one to ten, he would

21   estimate it as an eight or nine pain?

22         A       For normal volunteers, I presume?

23         Q       No.  For himself.

24         A       I'm going to assume he was a

25   normal volunteer, so I wouldn't argue with that.

1                          Wetli, M.D.

2          Q       Do you know whether or not Melinda

3    had a low pH?

4                          MR. BRAVE:   Objection.

5               Form.

6          Q       On hospital admission?

7          A       Yes.   I believe it was 7.14.

8          Q       You have considered her acidotic?

9          A       Yes.

10         Q       Would you consider her severely

11   acidotic?

12         A       I think severe would be

13   appropriate, yes.

14         Q       Would you agree that intense

15   physical activity can lead to a buildup of the

16   lactic acid?

17         A       Oh, yes.

18         Q       And isn't it a combination of the

19   buildup of lactic acid and the increase in

20   catecholamines that places an individual such as

21   Melinda at risk?

22                          MR. BRAVE:   Objection to

23               form.

24                          MR. BLEDSOE:   Join.

25                          THE WITNESS:   At risk for

1                        Wetli, M.D.

2              what?

3        Q      Death.

4        A      Yes, especially norepinephrine as

5   the catecholamine.

6        Q      And at least with respect to the

7   two studies that you say are not applicable

8   because they involve pigs, these and scientists

9   and medical doctors have found that repeated and

10  prolonged discharge of the Taser both increases

11  the lactic acid and increases catecholamine

12  levels; isn't that true?

13                   MR. BRAVE:  Objection to

14            form.

15                   THE WITNESS:  In the pigs,

16            yes.

17       Q      Now, there are no studies, as we

18  have discussed, that would clinically discount

19  that with respect to human beings; isn't that

20  true?

21                   MR. BRAVE:  Objection.

22            Form.

23       Q      Because we can't shoot human

24  beings up and take these kinds of tests,

25  controlled studies that would document that?

```
 1                      Wetli, M.D.
 2                 MR. BRAVE:  Objection.
 3           Form.
 4                 THE WITNESS:  No, that's not
 5           exactly true.  They, for example,
 6           have measured lactic acid levels and
 7           things like that in people who were
 8           volunteers who are subjected to
 9           Taser discharges.
10      Q    These volunteers are limited as
11  far as any published literature done by Dr. Ho,
12  at most, to three five-second discharges; isn't
13  that correct?
14                 MR. BRAVE:  Objection to
15           form.
16                 THE WITNESS:  That's
17           probably correct.  I don't recall
18           offhand.
19      Q    And these volunteers are law
20  enforcement officers or medical volunteers,
21  personnel volunteers; isn't that true?
22                 MR. BRAVE:  Objection.
23           Form.
24                 THE WITNESS:  Again, I don't
25           recall any particular college
```

```
1                    Wetli, M.D.
2           student.  Most likely, you're going
3           to wind up with medical and law
4           enforcement.  But if that was
5           exclusively his subject group, I
6           don't know.
7      Q    Well, it wouldn't surprise you if
8  none of the subject group are mentally ill and
9  none of the subject group are under the
10 influence of cocaine and methamphetamine, would
11 it?
12     A    That's true.  I would be surprised
13 if -- I can't imagine a study being done under
14 those circumstances.
15     Q    You would agree, as a medical
16 doctor, that pain increases catecholamine
17 levels?
18               MR. BRAVE:  Objection.
19          Form.
20               THE WITNESS:  Pain by
21          itself?
22     Q    Well, pain in conjunction with
23 what, would you think?
24               MR. BRAVE:  Objection.
25          Form.
```

```
 1                        Wetli, M.D.
 2          Q      You don't think pain has an
 3   influence on catecholamine levels?
 4          A      In and of itself, no.
 5          Q      Well, under what conditions would
 6   pain increase catecholamine levels?
 7                    MR. BRAVE:  Objection to
 8               form.
 9                    THE WITNESS:  When you have
10               pain associated with fight and
11               flight responses, but pain in and of
12               itself is not going to do that.
13          Q      Do you know or are you aware that
14   before the M26 Taser weapon was released in the
15   markets that it was tested on one or two dogs
16   and a pig or two and that was it?
17                    MR. BRAVE:  Object to form.
18                    THE WITNESS:  I don't know.
19          Q      Have you ever been advised that
20   the original data can't be located with respect
21   to the tests concerning these weapons?
22                    MR. BRAVE:  Objection.
23               Form.
24                    THE WITNESS:  No, I have not
25               been advised of that.
```

```
 1                        Wetli, M.D.

 2        Q      Do you know Dorin Penescu?

 3        A      No.

 4        Q      But you do know or have met max

 5   Neurheim?

 6        A      No.

 7        Q      Assume that Max Neurheim developed

 8   the M26 weapon and there's questions as to what

 9   role the CEO, Rick Smith, played.  But assuming

10   that they developed the Taser weapon and that

11   Max Neurheim has testified under oath that he

12   would consider one five-second discharge of the

13   Taser weapon to be the safe range.  Do you have

14   any reason to disagree with that statement?

15                        MR. BRAVE:  Objection.

16             Form.

17                        THE WITNESS:  No.

18        Q      Assume further that Dorin Panescu

19   is an expert in this case and that he has sworn

20   under oath that he agrees with that, that he's

21   an expert in electrical engineering and has been

22   involved in defibrillator research over a number

23   of years and that he agrees that one five-second

24   discharge of the Taser weapon is the safe range.

25   You have no reason to disagree with that either?
```

```
 1                    Wetli, M.D.
 2              MR. BRAVE:  Objection.
 3         Form.
 4              THE WITNESS:  No.
 5      Q    All individuals that exhibit
 6  symptoms of excited delirium don't die, do they?
 7      A    No, they don't.
 8      Q    Would you agree that if somebody
 9  has a cardiac arrest because of acidosis,
10  there's not going to be any objective signs at
11  autopsy?
12              MR. BRAVE:  Objection to
13         form?
14              THE WITNESS:  That is
15         correct.
16      Q    Would you agree that a pH taken
17  after arrest is not necessarily valid because
18  it's typically acidotic?
19              MR. BRAVE:  Objection.
20         Form.
21              MR. BLEDSOE:  Object to
22         form.
23              THE WITNESS:  I don't know
24         that.  You would have to ask an
25         internist that question.
```

```
 1                        Wetli, M.D.

 2         Q      Would you agree that it's not

 3    uncommon to get an elevated body temperature

 4    after a person is struggling?

 5         A      It's my understanding they can

 6    have minor increases in body temperature, but

 7    nothing very severe, like maybe a degree or so

 8    like marathon runners.

 9         Q      If you assume that prior to

10    Melinda's temperature being taken at the

11    hospital that she was treated with warming

12    blankets and assuming further that she was

13    medicated with succinylcholine and assume that

14    that has an unintended result or side effect on

15    occasion of causing hypothermia.

16               If you assume that to be true or

17    those facts to be true, Dr. Wetli, that may

18    invalidate your opinions about the cause of the

19    hypothermia?

20                    MR. BLEDSOE:   Object to

21               form.

22                    MR. BRAVE:   Join.

23         Q      Isn't that true?

24         A      It would have to know more about

25    the effects of the succinylcholine how to how
```

1                    Wetli, M.D.

2    rapidly the hypothermia develops after its

3    administration.  If a drug is given that is

4    known to result in hypothermia, then you would

5    obviously have to consider the contributory

6    effect of that drug, yes.

7          Q     Would you consider the

8    contributory effect of the warming blankets?

9          A     Not particularly.  It's not going

10   to help a person with hypothermia, but it's

11   probably not going to aggravate it all that much

12   when you're talking about those kinds of body

13   temperatures.

14         Q     Do muscle contractions cause the

15   release of lactic acid in the blood stream?

16         A     It can, yes.

17         Q     Do you understand that the Taser

18   weapon causes muscle contractions?

19         A     Yes.

20         Q     Would you agree that postmortem

21   blood tests of potassium are invalid?

22         A     Of course.

23         Q     For the jury, catecholamines, for

24   their understanding, are adrenaline and

25   noradrenaline?

1                      Wetli, M.D.

2                 MR. BRAVE:  Object to form.

3          Q     And that might not be exactly

4     precise, but for the jury to understand?

5          A     Right.  For all practical purposes

6     in the context we're talking about, the answer

7     is yes.

8          Q     Would you agree that when you're

9     in pain, you produce adrenaline?

10         A     No, I wouldn't agree with that.

11         Q     Would you agree that the Taser

12    stimulates or acts on the nervous system?

13                     MR. BRAVE:  Objection.

14              Form.

15                     THE WITNESS:  It interferes

16              with the peripheral nervous system,

17              yes.

18         Q     Would you agree with Dr. Demaio

19    that repeatedly subjecting somebody to a device

20    that causes the release of adrenaline can

21    contribute to the hyperadrenergic state?

22                     MR. BRAVE:  Objection.

23              Form.

24                     THE WITNESS:  The way you

25              stated it, I would have to agree.

```
 1                    Wetli, M.D.

 2          Q    Do you agree that the

 3  catecholamines are released by the excited

 4  delirium?

 5          A    Yes.

 6          Q    And do you agree that there's

 7  additional release of catecholamines due to the

 8  struggle?

 9          A    Well --

10          Q    If there is a police struggle?

11                    MR. BRAVE:  Objection.

12               Form.

13                    THE WITNESS:  It could

14               possibly heighten it.  If a person

15               has antecedent events, it could also

16               be that they've already achieved

17               their maximum as far as

18               catecholamines go.  And then the

19               police presence would not increase

20               it anymore.  This is something

21               that's never been studied, so you

22               can only speculate.

23          Q    Do you consider the Taser

24  applications a part of the struggle?

25          A    Yes.
```

                         Wetli, M.D.

1

2        Q      Do you have any opinion today as

3   to whether or not there was a delay, that the

4   delay in having paramedic Sainthill take Melinda

5   to the emergency room cause or contributed to

6   her death?

7                    MR. BLEDSOE:  Objection to

8             form.

9                    THE WITNESS:  I have no

10            opinions about that.

11       Q      Do you know Dr. Gowitt?

12       A      I think I met him once or twice.

13       Q      I'm sorry?

14       A      I think I met him once or twice.

15                   (Whereupon, at 12:25 p.m., a

16            recess was taken to 12:45 p.m.)

17                   (The deposition resumed with

18            all parties present.)

19   C H A R L E S   W E T L I, M. D.,      resumed

20        and testified further as follows:

21   BY MS. FRAZIER:

22       Q      Dr. Wetli, you were provided

23   certain information or the Rule 26 report of

24   plaintiff's use of force expert.  I believe

25   you've indicated that you're not an expert in

1                        Wetli, M.D.

2   the use of force and you do not intend to go

3   down that road at all?

4          A      Correct.

5          Q      There's been certain opinions

6   espoused about the inadequacy of Taser warnings.

7   Am I correct that you are not making any

8   representation one way or the other about the

9   adequacy or inadequacy of Taser warnings as it

10  relates to excited delirium?

11         A      That is correct.

12         Q      And at least from reviewing your

13  CV, it does not appear that you have been

14  through any of the Taser training programs; is

15  that correct?

16         A      Correct.

17         Q      Would you agree that muscle tetany

18  is a component of the Taser discharge?

19                    MR. BRAVE:  Objection.

20             Form.

21                    THE WITNESS:  It is a

22             component of it, yes.

23         Q      And for a jury, what does muscle

24  tetany refer to?

25         A      Basically a contraction.

```
 1                      Wetli, M.D.
 2         Q     You mentioned that you had been
 3    asked to and spoke at the Institute for the
 4    Prevention of In-Custody Deaths?
 5         A     Correct.
 6         Q     An organization associated with or
 7    owned by or operated by Mr. Peters and
 8    Mr. Brave.  Is it just the one time?
 9                    MR. BRAVE:  Objection to
10              form.
11                    THE WITNESS:  I spoke at the
12              conference in 2006 and in 2007.
13         Q     In addition to yourself, would you
14    consider Dr. Demaio to be another authoritative
15    expert on excited delirium?
16         A     Well, I consider him to be
17    qualified to give expert opinions on the
18    subject, yes.
19         Q     Do you agree with Dr. Ho's sworn
20    testimony and Dr. Demaio's sworn testimony that
21    excited delirium rarely occurs in the absence of
22    forced restraint?
23                    MR. BRAVE:  Objection.
24              Form.
25                    THE WITNESS:  No, I wouldn't
```

```
1                          Wetli, M.D.
2              agree with that.
3         Q     Do you agree that it often occurs
4    with forced restraint?
5         A     Yes.
6         Q     Do you agree that the mechanism
7    that triggers acidosis in excited delirium death
8    is still under debate?
9                     MR. BRAVE:  Objection.
10              Form.
11                    THE WITNESS:  I don't know
12              that.  To me, the consensus has
13              always been that it is due to the
14              extreme muscular prolonged exertion,
15              and I'm not sure of any other debate
16              aside from that.  At least I'm not
17              aware of it, anyway.
18        Q     Dr. Wetli, can you state with any
19   degree of reasonable medical probability that
20   Melinda would have died had she not had an
21   encounter with the police?
22                    MR. WILLIAMS:  Object to
23              form.
24                    THE WITNESS:  No, you cannot
25              state that definitely.
```

1                         Wetli, M.D.

2           Q      Can you state with any degree of

3    reasonable medical probability that Melinda

4    would have died had the EMS taken her from the

5    scene directly to the emergency room, therefore

6    she would not have had that additional 50 minute

7    or hour delay?

8                         MR. BLEDSOE:  Object to

9                  form.

10                        THE WITNESS:  Again, I

11                 cannot predict whether she would

12                 have survived or not.

13          Q      But you will agree, will you not,

14   that in these cases, prompt medical treatment

15   significantly increases the chance and rate of

16   survival?

17                        MR. BRAVE:  Objection.

18                 Form.

19                        MR. BLEDSOE:  Join.

20                        THE WITNESS:  I don't know

21                 if it significantly increases the

22                 chance of rate of survival.  I don't

23                 think there have been enough

24                 controlled studies to really

25                 underscore the harbingers of

```
1                    Wetli, M.D.
2               impending death.  What we know right
3               now is that hypothermia seems to be
4               one of them, but I'm not aware of
5               any particular studies that
6               absolutely confirm that.
7          Q     But you certainly recommend that
8    they get immediate medical treatment, do you
9    not?
10         A     Yes.  Once you recognize that it's
11   excited delirium, then of course the sooner you
12   get them to the hospital, probably the better.
13   But whether or not that is going to
14   significantly alter the outcome, I don't know.
15   They're studying that now, but nobody knows for
16   sure just yet.
17         Q     In the case of Melinda, would you
18   agree that in the year before she had an event
19   in which she exhibited the signs and symptoms of
20   excited delirium and was also diagnosed with
21   having consumed methamphetamine?
22         A     Yes, I was aware of that.
23         Q     And in that particular event, she
24   survived; correct?
25         A     Correct.
```

```
 1                        Wetli, M.D.

 2           Q      And in that event, she was taken

 3   timely from the scene to the emergency room,

 4   correct, and treated?

 5           A      Correct.

 6           Q      But in that event, she was not

 7   subjected to any Taser weapon; isn't that

 8   correct?

 9           A      Correct.

10           Q      Have you reviewed and/or discussed

11   with Dr. Ho any of his studies that showed

12   during a prolonged continuous exposure of the

13   Taser there was a drop in blood CO2?

14                      MR. BRAVE:  Objection.

15                  Form.

16                      THE WITNESS:  I don't recall

17                  that.  I didn't have any discussions

18                  about it in the first presentation.

19                  I don't recall that specific

20                  phenomenon.

21           Q      Would you have any reason to

22   disagree with his conclusions that suggest that

23   after a continuous prolonged exposure to the

24   Taser weapon that there is a drop in blood CO2

25   which he attributes to hyperventilation?
```

```
 1                      Wetli, M.D.

 2          A     That would make sense, yes.  I

 3   would agree with that.

 4          Q     Have you seen any of his material,

 5   his data, or discussed with him why the graft

 6   shows a sudden drop in the amount of breaths

 7   they're taking?

 8          A     I'm sorry.  In the amount of?

 9          Q     Breaths.  In other words the

10   subjects are hyperventilating?

11                      MR. BRAVE:  Objection.

12               Form.

13                      THE WITNESS:  Well, I

14               haven't discussed it with him.  As I

15               said before, I've seen the

16               presentations.  As I recall, they

17               kind of take deeper breaths,

18               increased respiratory executions as

19               compared to baseline.  I don't

20               recall whether it was actually

21               beating faster or not.

22          Q     He reports that the subject bear

23   down and grit it out for the last zero to ten

24   seconds due to the pain.

25          A     I wouldn't be surprised.
```

```
 1                      Wetli, M.D.

 2          Q      Would you agree with Dr. Gowitt

 3   that there were no physiologic findings on the

 4   autopsy that you would ordinarily expect for a

 5   chronic user of methamphetamine?

 6                      MR. BRAVE:  Objection.

 7               Form.

 8                      MR. BLEDSOE:  Join.

 9                      THE WITNESS:  I know of no

10               signs at autopsy of chronic

11               methamphetamine use, physiologic or

12               anatomic, nothing.

13          Q      In the materials that you were

14   provided, and I understand you weren't provided

15   everything in this case.  But are you aware that

16   there is a dispute in the evidence as to whether

17   Melinda had what has been described as a quiet

18   period at the scene?

19                      MR. BLEDSOE:  Object to

20               form.

21                      MR. WILLIAMS:  Join.

22                      THE WITNESS:  I was not

23               aware of that.

24          Q      The would you agree with

25   Dr. Demaio that there is a catecholamine
```

1                          Wetli, M.D.

2      response to pepper spray?

3            A      It would make sense.  I don't know

4      that for a certain, but that would make sense,

5      yes.

6            Q      Are you aware that there is

7      evidence in this case that Melinda may also have

8      been subjected to pepper spray?

9            A      I had not heard that, no.

10           Q      You were provided, and to refresh

11     your memory, Doctor, because I know there are a

12     lot of materials.  There is a second page,

13     Dr. Wetli, to the EMS report by Dr. Gearring.

14     That's what we were looking for.  You were

15     apparently only provided the first page of the

16     trip report?

17                      MR. BRAVE:  Objection to

18                  form.

19           Q      At least then for the evidence

20     that's been presented to you, you don't recall

21     any document that would indicate that there had

22     been pepper spray used against Melinda?

23           A      That is correct.

24           Q      Let me show you what's been

25     previously marked as Plaintiff's Exhibit No.

```
 1                      Wetli, M.D.
 2   92C.  It has been Bates stamped by the EMS
 3   attorney's office.  We Bates stamped it with
 4   their initials EMS3 and 4.
 5              The first page appears to be a
 6   document that you had that was, in part, as a part
 7   of the GBI report.  This is the GBI stamp being at
 8   the bottom, Dr. Wetli.  We've labeled that B6.
 9   But the second page is the complete record.
10              So at least prior to me showing
11   this, you don't recall seeing that report?
12        A     I don't recall it, no.
13        Q     Dr. Wetli, how do you
14   scientifically separate, if you can, a
15   predisposition to excited delirium due to drugs
16   from a predisposition due to psychosis?
17        A     You can' scientifically separate
18   them.  We know that some people who, according
19   to Dr. Mash's studies, fail to operculate
20   receptor sites in their brain are characteristic
21   of a people who develop excited delirium.
22              Why only a certain relatively small
23   group of individuals develops it, I don't think
24   anybody knows yet.  Likewise, what predisposes
25   certain people to mental illness to get excited
```

```
 1                      Wetli, M.D.
 2   delirium when you stop taking medications, I don't
 3   think anybody knows that either.
 4        Q     When you were a medical examiner,
 5   did you have occasions where you were to
 6   investigate possible excessive use of force by
 7   the police?
 8        A     Of course.  We always do that any
 9   time there is a death in police custody.
10        Q     Would you consider it important,
11   as a forensic pathologist, to examine her
12   clothing, examine the decedent's clothing?
13                    MR. BLEDSOE:  Object to
14              form.
15                    THE WITNESS:  As just a
16              blanket statement like that, it may
17              not be.  It depends on the actual
18              case.  Sometimes it is very
19              important.  Sometimes it's not so
20              important.  Generally, particularly
21              with a death in the police custody,
22              we prefer to examine the clothing as
23              well as examine the scene.
24        Q     Would you agree that the clothing
25   in certain circumstances could substantiate and
```

```
 1                          Wetli, M.D.
 2    or disprove the law enforcement's version of the
 3    facts?
 4          A      Absolutely.  Yes.
 5          Q      Were you aware that after the GBI
 6    had asked for the videotape film at the jail
 7    when Melinda was at intake that it was erased,
 8    copied over?
 9                      MR. WILLIAMS:  Object to the
10                  form.
11                      THE WITNESS:  I did not know
12                  that, no.
13          Q      Were you aware that Melinda's
14    clothing was never secured and Dr. Gowitt was
15    unable to examine it forensically?
16                      MR. BLEDSOE:  Object to
17                  form.
18                      MR. WILLIAMS:  Object to
19                  form.
20                      THE WITNESS:  I have no idea
21                  whatever happened to the clothes.
22          Q      Of course, you are aware that the
23    blood samples were taken centrally instead of
24    from the extremities, as would be recommended
25    for valid quantitative results?
```

```
 1                    Wetli, M.D.
 2                    MR. BRAVE:  Objection.
 3          Form.
 4                    MR. BLEDSOE:  Join.
 5                    THE WITNESS:  Well, if it's
 6          taken centrally, for example, it's
 7          peripheral.  But when you have as
 8          much of a time delay, it probably
 9          doesn't really matter very much.
10     Q     Were you aware that the admission
11 blood, that there was admission blood, but that
12 it was never tested?
13          A     Yes, I was aware of that.  Excuse
14 me.  I know that there was a hospital sample of
15 blood.  I don't know if it was admission blood
16 or not.
17          Q     That's more precise, yes.  There
18 was a predeath sample?
19          A     Correct.
20          Q     While she was still alive?
21          A     Correct.
22          Q     And you would agree that this
23 would have provided more accurate levels of what
24 her methamphetamine, the amount of
25 methamphetamine in her body prior to death?
```

                              Wetli, M.D.

1

2        A     Quite possibly.  Depending on

3   where in that hospitalization.  She's already in

4   multi-organ failure by that time.  It probably

5   isn't going to be that helpful.  What you really

6   need is an admission sample of blood.

7        Q     Assuming there was an admission

8   sample, that would be something you would be

9   interested in testing, as a forensic

10  pathologist?

11       A     Yes.  The preferred decision would

12  be to test it first in central blood.  And then

13  once you know what you're looking for, since

14  it's a limited sample, then you test.

15       Q     So if I understand correctly then,

16  it would be helpful for you as a forensic

17  pathologist to look at the clothing of an

18  in-custody death?

19       A     In general, that's a good

20  practice, yes.

21       Q     And it would be helpful to you, as

22  a forensic pathologist to have the admission

23  blood testing; correct?

24       A     Correct.

25       Q     Now, I don't know this.  I started

```
 1                        Wetli, M.D.
 2    to ask the question and I'll go forward with it.
 3    But assuming that the GBI asked to see the tape
 4    and it was copied over after the request was
 5    made but before they were able to view it, would
 6    you, as a forensic pathologist, be interested in
 7    looking at the tape to see her condition upon
 8    arrival at intake?
 9                        MR. WILLIAMS:  Object to
10                   form.
11                        THE WITNESS:  In general,
12                   you want to look at as much evidence
13                   as possible, so the answer would be
14                   yes.
15         Q    What, if anything, is the
16    difference in what has historically be described
17    as exhaustive mania and excited delirium?
18         A    The syndrome has undergone a
19    variety of name changes since it was first
20    described in 1849.  In the 1970s, the criteria
21    for what was then known as acute exhaustive
22    mania was seen in mental patients, in
23    hospitalized psychiatric patients, who had
24    basically the syndrome.
25                        It fulfilled certain criteria,
```

```
 1                        Wetli, M.D.
 2    including it had to be drug-free.  In the 1980s
 3    when the delirium cases began to appear, the idea
 4    was to separate the two to acute exhaustive mania
 5    term would be used for psychiatric patients with
 6    no drugs and excited or agitated delirium for
 7    individuals with drugs or it was drug-induced.
 8              As time progressed, the term acute
 9    exhaustive mania was virtually dropped and are now
10    considered excited delirium.  And for purposes of
11    death certification, then you also have to
12    determine what the cause of excitability was,
13    whether it was schizophrenia, encephalitis, or
14    drugs.
15         Q     You reviewed the Dr. Oliver's
16    autopsy; is that correct?
17         A     Yes.
18         Q     He was the medical examiner in
19    this case?
20         A     Correct.
21         Q     I believe you made a note in your
22    opinion as to his diagnosis or cause of death;
23    is that correct?
24         A     I repeated what he had determined
25    as the cause of date, yes.
```

```
 1                    Wetli, M.D.

 2          Q      The cause of death was attributed

 3    to?

 4          A      Cephalometic.

 5          Q      Poisoning syndrome malignant

 6    hypothermia due to methamphetamine toxicity.   As

 7    a medical doctor, just based on what he's saying

 8    the cause of death is, what does that mean to

 9    you as another forensic pathologist?

10          A      Excited delirium.

11          Q      Due to methamphetamine toxicity?

12          A      Correct.

13          Q      But would you agree Dr. Oliver was

14    relying on the central blood concentrations to

15    reach that conclusion?

16          A      No, I don't believe he was relying

17    on the concentrations to reach that conclusion.

18    I think he's relying on the qualitative aspect

19    that he was able to identify the cause of the --

20          Q      Have you discussed this case with

21    Dr. Oliver?

22          A      No, I have not.

23          Q      Were you made aware that

24    Dr. Oliver was flown out to Arizona by Taser to

25    give a little overview of the Taser whatever
```

1                        Wetli, M.D.

2    research supports their positions?

3                        MR. BRAVE:  Objection.

4          Form.

5                        THE WITNESS:  No.

6          Q      Have you ever been flown out to

7    Taser and been hosted in their research

8    facility?

9          A      I've never been to their facility,

10   period.  I've never been invited.

11         Q      When the Dr. Oliver referred to

12   methamphetamine toxicity, would you consider

13   that to be synonymous with methamphetamine

14   neurotoxicity?

15         A      I would say so, yes.

16         Q      Isn't methamphetamine

17   neurotoxicity as a requirement for that

18   diagnosis that there be certain levels of

19   methamphetamine?

20         A      I have no idea.  You're apparently

21   referring to a specific syndrome.  All I can

22   tell you is that excited delirium is induced by

23   anything that's going to be neurotoxic if you

24   have excited delirium.

25         Q      But with respect to his initial

```
 1                      Wetli, M.D.

 2   report, he doesn't state that the death was as a

 3   result of excited delirium, does he, or excited

 4   delirium syndrome?

 5          A     He states it elsewhere, but not in

 6   his report.  It basically says that his

 7   diagnosis as to the cause of death is a subset

 8   of excited delirium.

 9          Q     Doesn't he's state that after he's

10   been contacted by Taser International?

11                      MR. BRAVE:  Objection.

12                Form.

13                      THE WITNESS:  I don't know

14                when he stated that.  I know that I

15                believe it's in the affidavit.

16                Whether he stated it before that

17                affidavit or not or how that all

18                came to be, I have no idea.

19          Q     In other words, you don't know

20   from a time line as to when and what influence

21   Taser International had on Dr. Oliver's opinions

22   after he wrote his autopsy report?

23                      MR. BRAVE:  Objection to

24                form.

25                      THE WITNESS:  I have no idea
```

1                          Wetli, M.D.

2                 what contacts he ever had with

3                 Taser.  I have no idea.

4          Q     Did you receive Dr. Oliver's

5    initial deposition that was taken before his

6    affidavit?

7          A     I was not provided a copy of his

8    deposition, no.

9          Q     Were you aware, Dr. Wetli, that

10   prior to handcuffing Melinda that she was not

11   violent or showed no signs of violence?

12                     MR. WILLIAMS:  Object to the

13                form.

14                     THE WITNESS:  As I recall as

15                I stated in my report, when she was

16                first -- when the police officers

17                first encountered her, she was

18                acting violently towards objects but

19                not towards people.

20         Q     Were you provided all or a portion

21   of Deputy Griffin's testimony?  He was the

22   deputy that is not sued in this case and the

23   deputy that called EMS?

24         A     No.

25         Q     Have you in your career evaluated

```
 1                      Wetli, M.D.
 2   residential electrocution cases?
 3           A     Of course.
 4           Q     Would you agree that the forensic
 5   pathologist has to rely on the history or
 6   evidence at the scene because of a negative
 7   autopsy?
 8           A     Yes.  For household electrocution,
 9   yes.
10           Q     Yes, household?
11           A     Yes.
12           Q     In your evaluations of residential
13   electrocutions cases, have you ever had a
14   history of the decedent having a delay of some
15   time, even minutes before they succumbed?
16           A     Usual time frame is 13 seconds.
17           Q     But have you ever had any reported
18   delays for, say, ten minutes or longer?
19           A     No.
20           Q     Are you aware of any studies that
21   have suggested that in rare cases there is a
22   delay?
23           A     No.
24           Q     Do you know what current at
25   120-volts can cause ventricular fibrillation in
```

```
 1                     Wetli, M.D.

 2    humans?

 3                     MR. BRAVE:  Objection.

 4              Form.

 5                     THE WITNESS:  Not offhand.

 6              If I need to know that, I know where

 7              to look it up.

 8         Q    You are aware, of course, that the

 9    ground fault circuit interrupter, that purpose

10    of that is to prevent electrocution?

11         A    Correct.

12         Q    Do you know how much current is

13    supplied by the Taser weapon?

14                     MR. BRAVE:  Objection.

15              Form.

16                     THE WITNESS:  Again, I can

17              look that up.  I knew at one time.

18              It's a lot of voltage current, but I

19              don't remember.

20         Q    Would you agree that there needs

21    to be more studies done with respect to the

22    overlapping of wave forms when multiple Tasers

23    and/or prolonged and repeated tazing is being

24    used across the human chest?

25                     MR. BRAVE:  Object to form.
```

```
 1                    Wetli, M.D.
 2        Q     As it relates to ventricular
 3   fibrillation or cardiac arrhythmia?
 4                    MR. BRAVE:  Objection.
 5              Form.
 6                    THE WITNESS:  That sounds
 7              logical.  That's about as far as I
 8              can go with it.  The more you know
 9              about the application of an
10              instrument and its physiologic
11              effects, the more you are able to
12              deal with all kinds of situations.
13        Q     Dr. Wetli, in your opinion, how
14   can you conclude that Melinda did not have an
15   arrhythmia by the Taser right after her
16   prolonged period of being tazed?
17                    MR. BRAVE:  Objection.
18              Form.
19                    THE WITNESS:  Because we
20              know about electrocution, sudden
21              deaths from electricity, is that it
22              usually occurs in seconds, if not
23              immediately, with high exposure.
24              Once you get past that 13-second
25              interval, then obviously your heart
```

1                        Wetli, M.D.

2               is not fibrillating.

3        Q      Can your body, can your heart

4   readjust on a temporary basis?

5        A      No, not that I've ever heard of.

6        Q      Do all arrhythmias manifest right,

7   in your opinion, into ventricular fibrillation?

8                    MR. BRAVE:  Object to form.

9                    THE WITNESS:  No.

10                   Ventricular fibrillation is just one

11                   form of the heart not pumping blood,

12                   but there are other forms as well,

13                   the pulseless electrical activity

14                   and cardiac stem cell.

15       Q      Do you know the differences in the

16   wave forms of the M26 table weapon or the X26 in

17   the electrical characteristics of the

18   residential load forms?

19       A      No.  That's going beyond my area

20   of expertise.  I know there are differences, but

21   I'm not an electrical engineer.

22                   MS. FRAZIER:  That's it for

23                   me, guys.

24

25

```
 1                    Wetli, M.D.

 2   EXAMINATION

 3   BY MR. WILLIAMS:

 4        Q     Dr. Wetli, I think I do have a

 5   couple of questions.  Do you agree that it would

 6   be difficult for a non-medically trained person

 7   like a law enforcement officer to recognize a

 8   person was experiencing excited delirium?

 9        A     Absolutely correct.  I would not

10   expect a law enforcement officer to be able to

11   diagnose excited delirium in the field.

12        Q     And earlier in deposition,

13   Ms. Frazier was asking you about the contusion

14   on one of the Fairbanks's brain that was shown

15   on the photographs.  Would you agree that that

16   could have occurred from self-inflicted blows to

17   the head such as could be caused by Fairbanks

18   propelling herself out of the back of the patrol

19   car and onto he ground?

20        A     Yes.

21        Q     Or it could have been caused by

22   her striking her head on the interior of the

23   patrol car?

24        A     Yes.

25        Q     Was there any indication that the
```

```
 1                    Wetli, M.D.

 2   injury to the head contributed to her death?

 3         A     No.

 4         Q     Does the coagulopathy affect the

 5   bruising that's shown in a person's body?

 6         A     Yes.

 7         Q     And how does it affect it?

 8         A     You have a tendency -- back up.

 9   For one thing, when a person sustains a bruise,

10   as long as the injured area continues to be

11   perfused, the bruise over the next 24 to 48

12   hours will become more prominent and enlarged

13   before blood will pour into an injured area.

14   When you cannot coagulate the blood, even more

15   blood flows in there.

16         Q     Would that be an explanation for

17   the degree of bruising shown in some of the

18   photographs postmortem of Ms. Fairbanks?

19         A     Yes.  If you would have looked at

20   her at the time she was admitted to the

21   hospital, it would have been much less.

22         Q     If Ms. Fairbanks was going to

23   experience ventricular fibrillation as a result

24   of the use of the Taser on her, you would have

25   expected her to experience that within a matter
```

```
 1                    Wetli, M.D.

 2   of seconds after the discharges of Taser?

 3          A     Yes.  This is stuff that you have

 4   about 13 seconds of glucose remaining in your

 5   brain.  And once your heart fibrillates, there's

 6   no circulation to the brain.

 7          Q     Is the fact that she was by the

 8   evidence that's been presented in the case still

 9   kicking, conscious, screaming, and so forth for

10   a certain period of time, minutes, maybe as much

11   as 30 minutes after the use of the Taser suggest

12   that she did not experience the ventricular

13   fibrillation?

14          A     Correct.

15                    MR. WILLIAMS:  That's all

16              the questions I have.  Thank you.

17                    MR. BLEDSOE:  No questions.

18                    MS. FRAZIER:  I have a

19              couple of follow-up.

20                    MR. BRAVE:  Doctor, I've got

21              a couple.

22   EXAMINATION

23   BY MR. BRAVE:

24          Q     Dr. Wetli, with regard to

25   everything you have seen or been exposed to here
```

```
 1                        Wetli, M.D.
 2   today, the photos, new information, et cetera,
 3   do you have any changes or modifications to your
 4   opinions that you expressed in your September
 5   17, 2007 report?
 6          A     No, I do not.
 7          Q     Doctor, to a reasonable degree of
 8   medical certainty, if Ms. Fairbanks had not been
 9   under the under the under the influence of methamphetamine
10   on the day of her interaction with law
11   enforcement, do you believe that she would have
12   died when she did?
13                    MS. FRAZIER:  Objection to
14              form.
15                    THE WITNESS:  I can't answer
16              that question.  People with excited
17              delirium who are not restrained may
18              die of trauma from jumping off
19              buildings, drowning, all kinds of
20              things.  I just don't know what she
21              would have done.
22          Q     Do you believe that if she had not
23   had Methamphetamine in her system that day that
24   she would have experienced excited delirium?
25                    MS. FRAZIER:  Objection to
```

```
 1                        Wetli, M.D.
 2            form.
 3                 THE WITNESS:  She had three
 4            disposing factors to excited
 5            delirium.  The schizophrenia, the
 6            manic depressive, bot of which she
 7            had stopped taking her medication,
 8            and then the use of amphetamines.
 9            So any one of the three could have
10            precipitated it.  The one we can
11            identify in this case is the
12            amphetamine.
13       Q    Do you recall who the
14  methamphetamine was provided by to
15  Mrs. Fairbanks?
16       A    It's my understanding that she
17  usually was provided the methamphetamine by her
18  husband.
19                 MR. BRAVE:  Nothing further.
20  REDIRECT EXAMINATION
21  BY MS. FRAZIER:
22       Q    Just a couple of follow-up,
23  questions, Dr. Wetli.  How many times have you
24  testified on behalf of the government or law
25  enforcement?
```

1                    Wetli, M.D.

2           A    I have to answer that in two

3    parts.  The first part is as a medical examiner

4    on cases that I've autopsied and become involved

5    with indirectly as a medical examiner, whether

6    it occurred in my jurisdiction, is almost 100

7    percent of the time, so from several hundred

8    cases at least over the years.

9                    As far as the private cases are

10   concerned, such as this one, I would say about

11   probably around 90 to 95 percent of the time I'll

12   be testifying for the law enforcement or for a

13   governmental agency, that is, either being be sued

14   independently or in conjunction with law

15   enforcement agency.  But with death in police

16   custody, about 90 to 95 percent of the time it

17   would be for defense.

18           Q    Which would be on behalf of the

19   government or law enforcement?

20           A    Correct.

21           Q    So in summarizing this, it's 100

22   percent on behalf of the government or law

23   enforcement while you were active as a medical

24   examiner?

25           A    Correct.

                              Wetli, M.D.

1

2          Q      And 90, 95 percent of the time,

3    you were testifying on behalf of the government

4    or law enforcement in private practice?

5          A      Correct.

6          Q      And how many times have you

7    testified that the Taser caused or contributed

8    to a death?

9          A      Never.

10                    MS. FRAZIER:  That's all I

11              have.  Thank you.

12                    (Whereupon, the deposition

13              concluded at 1:40 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          C A P T I O N

3

4    The Deposition of CHARLES WETLI, M.D., taken in the

5    matter, on the date, and at the time and place set

6    out on the title page hereof.

7

8

9    It was requested that the deposition be taken by

10   the reporter and that same be reduced to

11   typewritten form.

12

13

14   It was agreed by and between counsel and the

15   parties that the Deponent will read and sign the

16   transcript of said deposition.

17

18

19

20

21

22

23

24

25

1

2                 C E R T I F I C A T E

3

4    STATE OF_____:

5    COUNTY/CITY OF_____:

6

7    Before me, this day, personally appeared

8    CHARLES WETLI, M.D., who, being duly sworn, states

9    that the foregoing transcript of his/her

10   Deposition, taken in the matter, on the date, and

11   at the time and place set out on the title page

12   hereof, constitutes a true and accurate transcript

13   of said deposition.

14

15

                     _____

16

                         CHARLES WETLI, M.D.

17

18

19   SUBSCRIBED and SWORN to before me this_____

20   day of _____, 2008, in the

21   jurisdiction aforesaid.

22

23

24   _____        _____

25   My Commission Expires            Notary Public

```
 1
 2                    DEPOSITION ERRATA SHEET
 3      RE:
        FILE NO.
 4      CASE CAPTION:    RUBY MANN   vs.
                         TASER INTERNATIONAL, ET AL.
 5
        DEPONENT:  CHARLES WETLI, M.D.
 6      DEPOSITION DATE: APRIL 7, 2008
 7      To the Reporter:
        I have read the entire transcript of my Deposition
 8      taken in the captioned matter or the same has been
        read to me.  I request for the following changes
 9      be entered upon the record for the reasons
        indicated.
10      I have signed my name to the Errata Sheet and the
        appropriate Certificate and authorize you to
11      attach both to the original transcript.

12      _____
        _____
13      _____
        _____
14      _____
        _____
15      _____
        _____
16      _____
        _____
17      _____
        _____
18      _____
        _____
19      _____
        _____
20      _____
        _____
21      _____
        _____
22      _____
        _____
23      _____
        _____
24      SIGNATURE:_____ DATE:_____
25                  CHARLES WETLI, M.D.
```

1

2                    I N D E X

3

    Witness:            Direct        Cross         Redirect

4

    Wetli, M.D.            5         146, 148        150

5

6                  E X H I B I T S

7

    Wetli, M.D.        Description                      Page

8   For Ident.

9   A          Subpoena.                                 6

10  B          Expert report of Charles Wetli,           8
               M.D.

11

    B1         Letter and e-mail communications          9

12             between Dr. Charles Wetli and
               Taser International.

13

    B2         Index for Expert Witness Binder.          9

14

    B3         Document titled Exhibit B.               10

15

    B4         Appendix C                               13

16

    B5         Appendix D.                              14

17

    B6         EMS reports.                             15

18

    B7         Radiographs Bates stamped 456,           15

19             455, 454, and 453.

20  B8         Plaintiff's initial disclosures.         17

21  B9         GBI investigative summary.               18

22  B10        Documents titled medical records,        24
               tab 7.

23

    B11        Documents titled Autopsy &               50

24             Toxicology Reports, tab 7.

25

1

2     I N D E X:   (Continued)

3

                    E X H I B I T S

4

5     Wetli, M.D.          Description                    Page
      For Ident.

6

7     B12        Documents titled Depos of Sgt.          50
                 Vicki Burge and Paramedic Gearring.

8

      B13        Document titled Dr. Gowitt Report       51
9                and Deposition.

10    B14        Rule 26 for Darrell Tidwell.            51

11    B15        Rule 26 for Charly Miller.              52

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T E

3    STATE OF NEW YORK   )

4                        ) ss.

5    COUNTY OF NEW YORK  )

6                   I, I. IRIS COOPER, a

7                   Shorthand (Stenotype) Reporter and

8                   Notary Public of the State of New

9                   York, do hereby certify that the

10                  foregoing Deposition, of the

11                  witness, CHARLES WETLI, taken at the

12                  time and place aforesaid, is a true

13                  and correct transcription of my

14                  shorthand notes.

15                       I further certify that I am

16                  neither counsel for nor related to

17                  any party to said action, nor in any

18                  wise interested in the result or

19                  outcome thereof.

20                       IN WITNESS WHEREOF, I have

21                  hereunto set my hand this 21st day

22                  of April, 2008.

23                  _____

24                  I. Iris Cooper

25